**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Walter David BARTON, Defendant– Appellant.**

**No. 00–10233.**

United States Court of Appeals, Fifth Circuit.

July 9, 2001.

---

Chad Eugene Meacham (argued), Dallas, TX, for Plaintiff–Appellee.

Helen Miller Liggett, Asst. Fed. Pub. Def. (argued), Lubbock, TX, for Defendant–Appellant.

Before POLITZ, DeMOSS and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

■ Defendant-appellant Walter David Barton appeals his conviction and sentence for 1) kidnaping, in violation of 18 U.S.C. § 1201(a)(1), and 2) using and carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).[1] For the following reasons, we affirm.

## I. BACKGROUND

Barton and Carolyn Tipton lived as lovers from 1997 to April 1999, during which time, the two of them had a tumultuous relationship. In April 1999, when Barton and Tipton were living in Coleman, Texas, Barton gave Tipton an engagement ring, which Tipton accepted. But soon thereafter, the two of them argued, and Barton left town and moved to Missouri.

One week after Barton left, Tipton wrote to him, declaring her love for him but also warning that he should not come back to town because the police would arrest him.[2] At the same time, however,

---

1. Barton's Notice of Appeal also included his conviction and sentence for possession of firearms by a felon, in violation of 18 U.S.C. § 922(g)(1), but his initial brief failed to contest them. Those issues not presented and argued in an appellant's initial brief are deemed waived. *See Webb v. Investacorp Inc.,* 89 F.3d 252, 257 n. 2 (5th Cir.1996).

2. The letter reads:
   David, Just a note to let you know what is going on around here. Shanna [Tipton's daughter] has turned me into Child Protective Agency and I know for a fact by the questions they ask me about you that she has given your name to the cops. I was told in no uncertain terms that the very second they see me even speaking to you or

Tipton began taking measures to protect herself as she knew Barton would return. She approached her daughter Shanna Rosales and asked her for a gun. Next, she purchased a single-shot shotgun from a pawn shop.

After receiving Tipton's letter, Barton returned to Coleman as expected. He went to Mika Mayo's home and asked her if Tipton still lived at the same address.[3] Because Tipton had previously told Mayo that she feared for her and her 14–year–old son Cody Lape's life if Barton ever returned, Mayo went in the middle of the night to Tipton's residence and warned her that Barton was back.[4] Mayo also took with her shotgun shells because she believed that Tipton had no ammunition.

Barton went to Tipton's house early in the morning of Friday, May 14, 1999. Tipton told Barton that she had to go to work, and thus, he was there for only a short moment. Barton told Tipton that he would come back later. Tipton went to work at her parents' greenhouse, but she did not tell them that Barton had returned.

After work, Tipton went to her home and apparently spoke with Barton, who suggested that he, Tipton, and Cody should leave Coleman County. Tipton, however, told Barton that she and Cody could not leave because she feared losing custody of Cody. She did not tell him that she did not wish to go with him if she could do so without losing Cody. Tipton did tell Barton that he could not stay at her house; thus, he stated that he would return that evening after dark.

That night, Tipton loaded the shotgun, turned off the lights, and hid in the bathroom with her son. Tipton told Cody that they would have to kill Barton, but Tipton ultimately determined that she could not kill him. Because the house was unbearably hot, she opened the front door, allowing Barton to enter later. He showed up with a .45 caliber semi-automatic handgun, which he pulled out of his waistband and showed to Tipton and Cody. Barton told Tipton and Cody that they were leaving with him, and he took them to a trailer owned by Don Estes, where Barton was staying. All three spent Friday night at Estes' place.[5] While at Estes' place, Barton made statements about wanting to kill Tipton's parents and Shanna.

The next morning, Barton and Tipton took Cody into town to allow Cody to work

---

see you anywhere near me that Cody will be taken from me. Shanna got that set up before they ever came into my home this morning. I thought we were being raided for drugs but when they came through the front door they were looking for you. When they didn't find you that is when I was told I had to stay away from you or lose Cody. No matter what has happened between us you need to know who your real enemies are here! And it's not me. Shanna has got things so messed up for me that I am not allowed to leave Coleman County. So whatever you do, *don't* come near me. I really believe when the cops see you again they will stop you. Don't come here. They cannot and do not have any legal right to keep us from writing each other. If you want to write me please do. If not, I also

understand. I can't leave here until I get these people off my ass. Just as soon as that happens I will be out of here. No matter what, don't come here. And no matter what you say, I still love you, will always love you, and not anything I thought you did will change that. Stay where you are at and don't come near this county. I need to hear from you so I'll know you got this letter. Love you always, /s/C.

3. Tipton was apparently being evicted at that time.

4. Mayo physically visited Tipton because Tipton did not have a telephone.

5. Cody claimed he was kidnaped from this moment forward.

for his grandfather. Although Cody stated that he felt kidnaped since Friday evening, he did not ask for help from his grandfather. Tipton and Barton spent the day together, including going out to the country where the two of them shot the .45 caliber pistol. During that time, Barton suggested that they take Cody to Fort Worth to spend the summer with his father, Daniel Lape. Later that evening, Barton and Tipton returned to Tipton's house, where Cody was waiting for them. The three of them spent the night at the house.

On Sunday morning, Barbara Williams, a friend of Tipton's, came to visit, but left shortly thereafter. Because Barton thought that Williams would contact the police, he left the house and told Tipton that he would return by 2:00 p.m. so that they could leave together. After Barton left, Cody went to a nearby convenience store and called Mayo to tell her to come to the house. He also contacted Shanna and requested her to bring Rhinnon, his niece, over for a visit. But he did not tell Shanna that Barton had been in the area, that Barton planned on returning to the house, that Barton had threatened to harm Shanna and her child, or that Barton had kidnaped him.

When Mayo arrived at Tipton's house, Tipton was hysterical. She was crying because Barton was coming back to take her and she did not want to leave. Tipton was worried about her family's safety. Tipton asked Mayo to take her to the hospital to see Williams, who worked as an emergency room technician. Upon meeting up with Williams, Tipton had Williams contact the police about Barton.[6] Tipton, however, gave Williams an incorrect name and date of birth as belonging to Barton to report to the Sheriff's Department.

Ultimately, Williams took Tipton and Cody to Tipton's parents' home. There, Tipton told her parents that Barton was forcing her to leave with him. Tipton's father told Tipton that he would take care of it and went to the Sheriff's office and told the Sheriff about what was going on. When Tipton's father returned to his house, he told Tipton that everything was taken care of. Eventually, Tipton got into an argument with her daughter Shanna, and she left with Cody back to her house. This occurred around 2:00 p.m. on Sunday, the time Barton said he would be returning to Tipton's home.

Once back at her house, Tipton saw Barton drive by. She had Cody go out and tell Barton that the police were looking for him. During this time, officers came by Tipton's home a few times, asking on one occasion where Barton was. Tipton told them that Barton was staying with Estes and that he was coming back. Later that day, Barton returned and was again told that the police were looking for him. He indicated that he would be back. During this time, Cody went to Williams' residence and asked her to take him to the store. She dropped him off at Tipton's house between 2:30 p.m. and 3:00 p.m.

After Cody was dropped off, Barton reappeared on foot, took Tipton and Cody across the street, and ordered them to take his truck and to pick him up away from the neighborhood. Tipton did as she was instructed, although she could easily have gone to the Sheriff's station that was only four blocks from her home. Thereafter, Barton took Tipton and Cody out to Estes' trailer. There, Barton instructed

---

**6.** Barton had been arrested in Missouri for shoplifting Actifed tablets. When his car was searched, the police found more than one ingredient for the clandestine manufacturing of methamphetamines.

Cody and Estes to return to town to get a few items.

Later, a sheriff's deputy came to Estes' home and asked Estes if he had seen Barton. The deputy indicated that Barton had kidnaped Tipton and Cody. Estes denied knowing Barton's whereabouts. Thereafter, Estes asked Tipton if she had been kidnaped. According to both Tipton and Cody, Barton overheard Estes' questioning, which caused Tipton to deny Estes' question. Estes subsequently purchased Tipton's furniture for $100.00 and received a receipt for that purchase. Barton apparently wanted things to appear as though Tipton had not been kidnaped.

Barton, Tipton, and Cody left Coleman and headed towards Fort Worth, where Cody's father lived. According to Tipton and Cody, when they arrived at Daniel Lape's home, Beverly Sue Clinton, who lived with Lape, opened the door but would not allow them to enter. Instead, Clinton told Tipton that she had called the police.[7] Barton, who was at the time in his truck, allegedly heard this statement and ordered Tipton and Cody back into the vehicle. Rather than enter the home, Tipton and Cody returned to the truck.[8]

Between May 17, 1999, and May 24, 1999, Barton took Tipton and Cody from Texas to Idaho. Along the way, Barton and Tipton shoplifted numerous items and pawned them for money. On various occasions, Tipton and Cody would attempt to pawn the items while Barton remained in the vehicle.[9] Neither Tipton or Cody asked for help. At one point, Tipton mailed a postcard to her father from Dalhart, Texas. In addition, Barton had Cody

call his father to tell him that they were in Durango, Colorado, although they were actually in Wyoming.

The trio's journey eventually ended in Idaho, after their vehicle got stuck in the mud. Barton became violent, hitting Tipton and shooting his gun at her. He also struck Cody with the shotgun and a flashlight. Eventually, Barton sent Cody to get help, at which time, Cody contacted the police and told them that his mother and he had been kidnaped.

Barton was charged with 1) two counts of kidnaping, in violation of 18 U.S.C. § 1201(a)(1); 2) one count of using and carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and 3) one count of possession of firearms by a felon, in violation of 18 U.S.C. § 922(g)(1). A jury found him guilty of all the charges, except for one of the kidnaping counts. The jury was hung as to whether Barton had kidnaped Tipton.

The district court sentenced Barton to life in prison on the kidnaping count with respect to Cody; 120 months on the felon in possession count to run concurrently; and 120 months on the using and carrying a firearm in relation to a crime of violence count to run consecutively. Additionally, a mandatory special assessment of $300 was imposed. Barton timely filed his notice of appeal.

## II. DISCUSSION

In his initial appellate brief, Barton raises three issues. First, Barton asserts that there is insufficient evidence to show that Cody's travels with him were nonconsensual or that he knew that Cody did not want

---

7. Tipton's mother had already notified Clinton that Tipton and Cody had been kidnaped.

8. In contrast to Tipton's and Cody's testimony, Clinton testified that she wanted the two to enter the home and wait for the police.

9. On another occasion, Cody remained in the vehicle with a loaded shotgun while Barton and Tipton went into a store to shoplift.

to accompany him on their trip. Second, Barton maintains that, as a matter of law, an individual cannot be convicted of kidnaping a minor if that minor's custodial parent voluntarily accompanies that individual. Because the jury did not convict him of kidnaping Tipton, the custodial parent, Barton insists that he could not have kidnaped Cody. Third, referring to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), for support, Barton contends that the jury had to find beyond a reasonable doubt the element of discharging a firearm to subject him to the increased mandatory minimum sentence under 18 U.S.C. § 924(c)(1)(A)(iii). In a supplemental brief, Barton offers a similar argument, but predicated on *Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000). He complains that discharging a firearm in connection with a crime of violence, as stated under § 924(c)(1)(A)(iii), is a separate offense, and consequently, all of its elements should have been submitted to the jury. We review each argument in turn.

### A. Sufficiency Of The Evidence

■ In reviewing a challenge to the sufficiency of the evidence, we must determine whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir.1993). All reasonable inferences drawn from the evidence and all credibility determinations are viewed in the light most favorable to the verdict. *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir.1997). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction[ ]." *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir.1992) (internal quotation marks and citations omitted). But when a defendant fails to renew his motion for acquittal at the close of all the evidence, plain error is the standard of review for a sufficiency challenge. *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir.1993). Here, Barton did not renew his motion for acquittal at the close of all the evidence; thus, we review for plain error.[10] Under the plain error standard of review, a conviction may be reversed only to avoid a manifest miscarriage of justice. *United States v. Parker*, 133 F.3d 322, 328 (5th Cir.1998). " 'Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.' " *Id.* (quoting *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir.1992) (en banc)).

■ To prove a charge under 18 U.S.C. § 1201, the government must prove four elements: (1) the transportation in interstate commerce (2) of an unconsenting person who is (3) held for ransom or reward or otherwise, (4) such acts being done knowingly and willfully. *United States v. Osborne*, 68 F.3d 94, 100 (5th Cir.1995). Barton contends that the government did not establish two of those elements.

First, Barton avers that Cody was not an unconsenting person. For support, he refers to numerous occasions when Cody could have sought help, escaped, or had Barton placed under arrest, but did nothing. Additionally, Barton maintains that

---

**10.** Barton did file a motion for new trial, but that motion clearly distinguished itself from a motion for judgment of acquittal. The denial of a motion for new trial is reviewed for abuse of discretion. *See Whitehead v. Food Max*, 163 F.3d 265, 269 (5th Cir.1998). Barton, however, does not appeal that denial, and that issue is, therefore, not before us.

Cody's actions were similar to those of the alleged victim in *United States v. Chancey*, 715 F.2d 543 (11th Cir.1983), where the Eleventh Circuit reversed a kidnaping conviction notwithstanding the alleged victim's testimony that the defendant, Chancey, had seized her at gunpoint and had locked her in the trunk of his car. In *Chancey*, the Eleventh Circuit concluded that no rational jury could have found that the alleged victim was transported involuntarily. That court noted that the victim was the sole witness to lack of consent, did not take advantage of numerous opportunities to escape or seek help (including a discussion with a police officer), was seen behaving playfully with the defendant, and agreed voluntarily to frequent sexual intercourse with the defendant. *Id.* at 547. The victim testified that she was too afraid to seek help, but the court determined that her testimony was inherently incredible. *Id.* at 546–47.

Barton's second argument is that he did not act knowingly and willfully. Tipton and Cody testified that they went along with Barton for fear of their lives. Because those two were attempting to convince Barton that everything was "normal," Barton maintains that he did not know that those two did not want to go along with him and that his actions were consistent with those of a person who believed Cody wanted to come on the trip.

█ After reviewing the record, we are not convinced that it is devoid of evidence pointing to guilt or that the evidence on the two elements was so tenuous that a conviction would be shocking. Some of Cody's actions may not have been indicative of one who had been kidnaped, but he specifically indicated to Officer Skindlov in Idaho that he had been kidnaped from Texas. Moreover, Cody reaffirmed those statements in front of the jury at trial. As for Barton's reliance on *Chancey*, we note that it is not controlling, but merely persuasive, authority. And unlike, in *Chancey*, Cody was not the sole witness to the lack of consent, and his declaration of having been kidnaped was not inherently incredible. Thus, we are hard-pressed under the plain error standard to find that Cody was not an unconsenting individual.

█ With respect to Barton's second argument, the evidence showed that Barton told Tipton that they would be leaving Coleman, that Barton threatened to harm Tipton's family in front of Tipton and Cody, that Barton had easy access to a firearm, that Tipton attempted to dissuade Barton from taking her and Cody, and that Barton, nevertheless, took Tipton and Cody on an interstate romp through the West. In addition, testimony revealed that Barton forced Tipton to conduct a sham sale of her furnishings to Estes so that Estes could be allowed to enter Tipton's home without trouble and to retrieve items so as to make it appear that Tipton and Cody had not been kidnaped. Furthermore, Barton forced Cody to call his father in Fort Worth and to lie to him about where the three of them were and to tell him about the undesirability of cops. All of that direct and circumstantial evidence suggests that Barton knew that he had taken Cody against his will and yet willfully acted to take him across state lines. Accordingly, we cannot conclude that there was a manifest miscarriage of justice, and we find Barton's sufficiency of the evidence claim unavailing.

B. Whether Barton Can Be Convicted Of Kidnaping Cody When He Was Not Convicted Of Kidnaping Tipton

█ Barton next contends that, as a matter of law, when a minor is traveling with his custodial parent and another individual, that individual cannot be convicted of kidnaping the minor child when voluntarily accompanied by the custodial parent.

Here, Tipton is the custodial parent, and under section 151.003 of the Texas Family Code, she has the right to direct the travel of her child. Barton asserts that Tipton implicitly consented to Cody's traveling with her from Texas to wherever she was going with Barton. To support his contention, Barton points to an allegedly absurd result that would occur if this court were to allow a kidnaping conviction of a minor based upon that minor's lack of consent when a custodial parent voluntarily travels with another individual. According to Barton, if every 14–year–old child who dislikes his parent's girlfriend or boyfriend were allowed to assert that he had been kidnaped because he did not want to travel with his parent and the parent's boyfriend or girlfriend, allegations of kidnaping would easily abound. Lastly, Barton notes that in the case of kidnaping, a minor who is over the age of ten has the ability to give consent even if his or her parents do not. *See Chatwin v. United States,* 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946). As such, he argues that the opposite should apply: a custodial parent's consent should prevent a kidnaping even if the child does not consent.

Although Barton makes an interesting argument, it is inapplicable to the present case. There was no specific finding or determination that Tipton voluntarily joined Barton on his trip. Admittedly, Barton was not convicted of kidnaping Tipton, but the jury actually hung as to whether Barton kidnaped her. Lacking the factual basis that Tipton voluntarily went with Barton, we find Barton's legal argument unavailing.

C. Alleged Error Under *Apprendi v. New Jersey*

■ Barton's third point of error charges that the jury had to find beyond a

reasonable doubt the element of discharging a firearm to subject him to the increased mandatory minimum sentence under 18 U.S.C. § 924(c)(1)(A)(iii). Because he failed to make this objection in the district court, we review for plain error. *See United States v. Meshack,* 225 F.3d 556, 576 (5th Cir.2000), *cert. denied sub nom. Parker v. United States,* 531 U.S. 1100, 121 S.Ct. 834, 148 L.Ed.2d 716 (2001).

Right from the beginning, Barton concedes that *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), directly forecloses his argument. Nevertheless, he insists that the Supreme Court's recent decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), has altered the legal landscape. *Apprendi* held that any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury. *Id.* at 2363–64. It, however, did not indicate that items that increase the mandatory minimum sentence had to be submitted to the jury. Indeed, it expressly limited its holding so as not to overrule *McMillan. See id.* at 2361 n. 13. As a result, we have limited *Apprendi* to cases involving facts that increase the penalty beyond the statutory maximum. *See Meshack,* 225 F.3d at 576. Consequently, Barton's third point of error is without merit.

D. Alleged Separate Offense Under *Castillo v. United States*

In his supplemental brief, Barton complains that § 924(c)(1)(A)'s various penalty provisions,[11] such as for discharging a fire-

---

**11.** The statute and penalty provisions in question read:

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by

arm in connection with a crime of violence, do not embody sentencing enhancements but set out separate offenses. Hence, he again asserts that whether he discharged a firearm in connection with an underlying crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), should have been submitted to the jury. Instead of referring to *Apprendi*, Barton primarily relies on *Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000). As with the *Apprendi* issue, he did not raise the present argument in the court below, and we review it for plain error.

In *Castillo*, the Supreme Court analyzed a prior version of § 924(c)(1)[12] to determine whether certain words created offense elements or sentencing factors. *Id.* at 2091. That prior statute "prohibit[ed] the use or carrying of a 'firearm' in relation to a crime of violence, and increase[d] the penalty dramatically when the weapon used or carried [wa]s, for example, a 'machinegun.'" *Id.* After considering the language, structure, context, and legislative history of § 924(c)(1), the Court concluded that the statute used the word "machinegun," and similar words, to state an element of a separate offense. *Id.* at 2092–93.

Despite *Castillo*'s determination that a prior version of § 924(c)(1) laid out sepa-rate offenses as opposed to sentencing factors, we do not believe its analytical framework leads to the same conclusion with respect to the new § 924(c)(1)(A). Initially, we note the language and structure of the statute itself. "The first clause of § 924(c)(1)(A), standing alone, defines the offense of using or carrying a firearm during a crime of violence while subsections (i), (ii), and (iii) do 'no more than single out subsets of those persons [who carry or use firearms during crimes of violence] for more severe punishment....'" *United States v. Carlson*, 217 F.3d 986, 987 (8th Cir.2000) (quoting *United States v. Haggerty*, 85 F.3d 403, 405 (8th Cir.1996)), *cert. denied*, 531 U.S. 1095, 121 S.Ct. 822, 148 L.Ed.2d 706 (2001); *see also Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 1219, 143 L.Ed.2d 311 (1999) (observing that the structure of former 18 U.S.C. § 2119, with a principal paragraph followed by numbered subsections, suggests that the statute sets forth sentencing factors). Indeed, those subsections "are separated from the offense clause of the statute by the word 'shall'—a frequent separator of offense-defining clauses from sentencing provisions." *Carlson*, 217 F.3d at 988. Furthermore, the subsections do not increase the maximum penalty for the crime committed, nor do they create sepa-

this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

12. In 1998, Congress amended § 924(c)(1), separating its language into different parts and adding subsections (A)-(D). *See* Pub.L. No. 105–386, § 1(a)(1), 112 Stat. 3469. The provisions concerning the type of weapon used, which formed the basis for old § 924(c)(1), were essentially placed at § 924(c)(1)(B). Section 924(c)(1)(A), which is at issue in the instant case, speaks of the manner in which a firearm was used.

rate offenses calling for separate penalties. *See McMillan,* 106 S.Ct. at 2417. Rather, they operate solely "to limit the sentencing court's discretion in selecting a penalty within the range already available to it." *Id.* Thus, we do not face the same concern that troubled the Supreme Court in *Castillo* and *Jones* : the realization that the finding of a certain statutory fact would expose the defendant to a term of imprisonment more severe than would have been permitted without the finding of that fact. *United States v. Harris,* 243 F.3d 806, 811–12 (4th Cir.2001).

Additionally, for Barton, the legislative history of the 1998 amendments to § 924(c) is, at best, inconclusive. *See id.* at 810. At worst, the history indicates that Congress viewed the subsections as penalty enhancements. *See* H.R.Rep. No. 105–344, at 2 (1997) ("[Amendment] provides for an increased mandatory penalty for any person who possesses, brandishes or discharges a firearm during and in relation to the commission of a federal crime of violence or drug trafficking crime."). And Congress appears to have altered the original bill to reflect that intention. *Harris,* 243 F.3d at 811 (noting that the final bill did not include brandishing or discharging as actus reus elements of the offenses proscribed in the initial principal paragraph).

Finally, the Supreme Court itself in *Castillo* recognized that courts have traditionally viewed certain items as sentencing factors, such as the manner in which a basic crime was carried out. *Castillo,* 120 S.Ct. at 2094. As an example, the Court specifically mentioned brandishing a gun, one of the subsections of the contested statute. *Id.* Like with brandishing a gun, § 924(c)(1)(A) outlines discharging a gun as a manner in which the basic crime of violence or drug trafficking crime is carried out. Therefore, the Court's reference in *Castillo* about traditional sentencing factors should apply equally to the instant case.

In light of the language, structure, context, and legislative history of § 924(c)(1)(A), we join the vast majority of circuits that have reviewed this or a similar issue to conclude that subsections (i), (ii), and (iii) set forth sentencing factors, not separate elements of different offenses. *See United States v. Pounds,* 230 F.3d 1317, 1319 (11th Cir.2000), *cert. denied,* — U.S. ——, 121 S.Ct. 1631, 149 L.Ed.2d 492 (2001) (holding that the discharge of a weapon under § 924(c)(1)(A)(iii) is a sentencing factor); *see also Harris,* 243 F.3d at 812 (concluding that the "brandished" clause of § 924(c)(1)(A)(ii) sets forth a sentencing factor that need not be charged in the indictment); *Carlson,* 217 F.3d at 989 (same); *cf. United States v. Sandoval,* 241 F.3d 549, 550 (7th Cir.2001) (holding that the classification of a firearm as a "semiautomatic assault weapon" under § 924(c)(1)(B)(i) is a sentencing factor). *But see United States v. Bandy,* 239 F.3d 802, 807 (6th Cir.2001) (applying *Castillo* to new § 924(c)(1)(B) to conclude that the type of weapon used is an element of the offense). Consequently, Barton's *Castillo* contention is unavailing.

## III.   CONCLUSION

For the foregoing reasons, Barton's conviction and sentence are AFFIRMED.