IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-30269
_____


UNITED STATES OF AMERICA

                                        Plaintiff - Appellee

        v.

ABRAM RECASNER, also known as Abram Racasner

                                        Defendant - Appellant

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
(00-CR-72-ALL-K)
_____
January 29, 2002

Before KING, Chief Judge, and HIGGINBOTHAM and DAVIS, Circuit
Judges.

PER CURIAM:[*]

    Defendant-Appellant Abram Recasner appeals his conviction

for two counts of cocaine possession.  For the following reasons,

we AFFIRM.

---

    [*]  Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

## I.  PROCEDURAL HISTORY

On September 21, 2000, Defendant-Appellant Abram Recasner was charged, pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii), and (b)(1)(C) (1999), with one count of possession with intent to distribute fifty grams or more of cocaine base and one count of possession with intent to distribute less than 500 grams of cocaine hydrochloride.  On November 2, 2000, the district court denied Recasner's motion to suppress evidence obtained in a warrantless search of his vehicle.  On November 28, 2000, the district court denied Recasner's motion for mistrial based on the inadvertent introduction of extrinsic material not in evidence into the jury room.  Also on November 28, after a two-day trial, a jury found Recasner guilty on both counts of cocaine possession.  On February 14, 2001, the district court sentenced Recasner to 151 months imprisonment on each count, to be served concurrently.  Recasner timely appeals the district court's judgment, specifically the denial of his motion to suppress evidence, the district court's ruling that the government's peremptory strike of an African-American juror was race-neutral, his conviction by the jury, and the district court's denial of his motion for mistrial.

## II.  MOTION TO SUPPRESS EVIDENCE

Recasner contends that the district court erred in denying his motion to suppress evidence seized in a warrantless search of

his vehicle because Recasner asserts that the detective who seized the evidence lacked probable cause.  On appeal of a motion to suppress evidence, this court reviews the district court's factual findings for clear error and reviews the court's "conclusions regarding the constitutionality of a warrantless search de novo."  United States v. Vega, 221 F.3d 789, 795 (5th Cir. 2000) (internal citations and quotations omitted).  We view the facts in the light most favorable to the prevailing party, the government in this case.  United States v. Howard, 106 F.3d 70, 73 (5th Cir. 1997).

At the hearing on the motion to suppress, the district court heard the following evidence.  New Orleans Police Department ("NOPD") Detective Robert Ferrier testified to the following version of events.  On March 16, 2000, he received a tip from a confidential informant.  The informant told Ferrier that an African-American male known to the informant as "Abe" would participate in a narcotics transaction with another unknown African-American male sometime between 2:00 and 2:30 p.m. on March 16, 2000, at a specified New Orleans intersection.  The informant offered a description of "Abe" and said that Abe would be driving a maroon Buick.  Ferrier indicated that the informant was reliable and previously provided information leading to at least five arrests for drug offenses, but admitted that no convictions resulted from that informant's prior tips as of March 16, 2000.

On March 16, Ferrier and other NOPD detectives set up surveillance of the specified intersection at approximately 1:45 p.m. Although Ferrier had an unobstructed view of the intersection via binoculars, he was the only detective with a view of the intersection. Ferrier maintained contact with the other detectives in the vicinity by police radio. At approximately 2:10 p.m., Ferrier saw a maroon Buick approach the intersection and park approximately forty feet from it. Ferrier wrote down the license plate number of the Buick. A blue truck occupied by two African-American males then approached the intersection and parked. The driver of the Buick, later identified as Recasner, exited the Buick, and at the same time, the two other males exited the blue truck, one carrying a white and green plastic bag with a "Foot Action" logo. Ferrier observed Recasner remove a "wad or bundle" of what Ferrier believed to be currency from the Buick and approach the two males at the rear of the blue truck. Recasner handed the currency to one of the males who then handed the Foot Action bag to Recasner in return. Recasner then opened the Foot Action bag and removed a brown paper bag, from which he in turn removed a "white object." Recasner then replaced the white object in the brown paper bag and, in turn, replaced the brown bag in the Foot Action bag. Recasner then returned to the Buick and departed the intersection. Ferrier indicated that the entire transaction occurred within approximately twenty seconds and that he believed

4

from his experience as a narcotics officer -- having observed many "hand-to-hand" drug deals -- that the white object was contraband. Ferrier testified that he believed he had witnessed an illegal narcotics transaction between Recasner and the occupant of the blue truck. Ferrier broadcast the following information over his radio to the other officers assisting with the surveillance, including Detective Kyle Hinrichs: a description of the blue truck, a description of the Buick and its driver, and the Buick's license number. Ferrier also broadcast his belief that the Buick driver was in possession of "contraband or drugs." Ferrier admitted that he was the only detective who observed the blue truck.

Detective Hinrichs testified to the following version of events. Ferrier told him of the information provided by the confidential informant prior to the surveillance. Hinrichs also received Ferrier's radio broadcast regarding the narcotics transaction between the Buick driver and an occupant of the blue truck, which broadcast indicated that the driver of the Buick was in possession of a Foot Action bag containing what Ferrier believed to be "drugs," and provided a description of the Buick and its license number. Hinrichs then spotted the Buick, verified that its license number matched the number relayed to him by Ferrier, and, without a warrant, stopped the vehicle and placed the driver in the back of an NOPD vehicle. Hinrichs observed a green and white plastic bag on the seat of the Buick

5

that matched the one described to him by Ferrier over the radio. Then, also without a warrant, Hinrichs removed the bag, examined its contents, and found an open box of plastic sandwich bags and packages of white substances, later identified as powder and crack cocaine, within the green and white bag.

Recasner testified at the hearing and also called two defense witnesses, Lionell Carter, Jr. and John Elder. Carter testified that he lived in an apartment near the specified intersection where the alleged drug transaction took place, that Recasner visited Carter there on March 16 from approximately 12:30 p.m. to 2:30 p.m., and that Carter observed Recasner drive off without talking to, or receiving anything from, any other person. Elder testified that he observed a police car following Recasner's Buick, observed an officer place Recasner in the back of an NOPD vehicle, and observed an officer searching Recasner's trunk. Recasner testified that he visited Carter on March 16 and that, prior to being stopped by Hinrichs, Recasner made no stops, did not meet or talk with anyone in a blue truck, and that he never observed any blue truck.

In Illinois v. Gates, 462 U.S. 213 (1983), the Supreme Court established that the test for whether a police officer had probable cause to conduct a warrantless search based on an informant's tip looks to the totality of circumstances establishing the reliability of the tip. See United States v. Reyes, 792 F.2d 536, 539 (5th Cir. 1986). The district court

6

based its decision that Hinrichs had probable cause to search Recasner's vehicle on the "evidence received and the Court's assessment of the credibility of the witnesses," including "the fact that there was an informant who notified police of the possible transaction involving narcotics, that there was surveillance set up in order to corroborate that information, and in fact, the corroboration took place by Detective Ferrier observing what was obviously a contraband transaction."[1]  While the trial court noted that the license number for the blue truck was never obtained and that the blue truck was never found, the court expressly credited Ferrier's testimony, finding that he did not "confabulate" the blue truck and "clearly saw the transaction."  The facts credited by the district court are sufficient to support its finding that Hinrichs had probable cause to conduct a warrantless search of Recasner's vehicle based on the information supplied to him by Ferrier.  See, e.g., United States v. Antone, 753 F.2d 1301, 1304 (5th Cir. 1985) (finding probable cause for a warrantless search based on an officer's testimony that an informant had supplied reliable information in the past and that the tip indicated when, where, and how the transaction would occur, along with the fact that the tip was

---

[1]     The district court used the term "proximate cause," not probable cause.  The government explains that Recasner's attorney misstated the term as "proximate cause" when questioning Ferrier, and for some unstated reason, both parties and the court continued using that incorrect term throughout the proceedings when they meant to refer to "probable cause."

7

corroborated by an experienced narcotics detective's independent observation of the transaction).[2]

We reject Recasner's contention that the fact that Ferrier failed to note the license number of the blue truck renders Ferrier's testimony so implausible that the district court clearly erred in crediting that testimony over contradictory testimony by Recasner and his two defense witnesses. See United States v. Gillyard, 261 F.3d 506, 509 (5th Cir. 2001) ("[W]hen a trial judge's finding is based on [that judge's] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.") (internal quotation omitted). The district court did not err, therefore, in finding that Hinrichs had probable cause to conduct the warrantless search of Recasner's vehicle. Thus, the court did not err in denying Recasner's motion to suppress evidence seized in that search.

III. **PEREMPTORY STRIKE OF THE AFRICAN-AMERICAN JUROR**

Recasner contends that the district court erred in ruling that the government's peremptory strike of an African-American female juror, "juror 23," was race-neutral and therefore proper.

---

[2]  Recasner does not contest that Hinrichs could form probable cause based on information communicated to him by Ferrier that was sufficient for Ferrier to form probable cause.

In a challenge to a peremptory strike made pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), we analyze whether a party exercised the strike in a discriminatory manner in three steps: (1) the opponent of a strike must make a prima facie showing that the strike was exercised on the basis of race, (2) the burden then shifts to the party exercising the strike to articulate a race-neutral explanation, and (3) the burden shifts back to the opponent of the strike to prove purposeful discrimination. United States v. Williams, 264 F.3d 561, 571 (5th Cir. 2001) (quotation and citation omitted). We review the district court's determination that the government's strike of juror 23 was not racially motivated for clear error. Id. When a trial court accepts a plausible, race-neutral explanation offered by a party and thus allows a challenged strike to stand, this court will rarely disturb that decision because "ultimately the inquiry boils down to whether the [party] should be believed," which is "quintessentially a question of fact which turns heavily on demeanor and other issues not discernable from a cold record, such that deference to the trial court is highly warranted." Id. at 572.

In this case, the government prosecutor furnished two such plausible, race-neutral reasons, stating: "I don't let teachers on juries. The second reason is she was a character witness for a defendant in a murder trial," and thus that he felt juror 23

9

had "a favorable bent toward the defense."[3] The prosecutor further explained, "My experience as a prosecutor is I have always found that teachers tend to be more liberal, more forgiving." Although the district court indicated that the composition of the jury disturbed that court because the jury included only one African-American in its final total of twelve jurors, the court stated that it would be more disturbed if "there were no African-Americans on this jury." The court thus allowed the strike. Given that the district court had the opportunity to observe the demeanor of the prosecuting attorney when that attorney offered a race-neutral explanation for the challenged strike, we cannot say that the district court clearly erred in accepting that explanation. Moreover, Recasner offers no rebuttal evidence of any discriminatory intent on the part of the government beyond his original assertion that the jury composition was facially suspect. The district court did not clearly err, therefore, in ruling that the peremptory strike of juror 23 was not racially motivated.

### IV. JURY VERDICT

Recasner contends that the jury erred when it found him guilty of two counts of cocaine possession. Recasner reasserts his contention that Ferrier's testimony regarding the existence

---

[3] The prosecutor then admitted that he knew that juror 23 had never testified in any murder trial but had only "agreed" to testify.

of the blue truck is implausible.  He also contends that Ferrier's testimony regarding the drug transaction is likewise implausible because that testimony does not indicate that Ferrier observed either Recasner or the alleged occupants of the blue truck weighing contraband or counting money.  Recasner further contends that the real motive behind his arrest and conviction was animosity arising from a prior incident after which Recasner claims he complained to the NOPD that Ferrier and Hinrichs assaulted Recasner while arresting him.  Recasner thus contends that the implausibility of Ferrier's testimony along with Recasner's testimony regarding improper motives on the part of Ferrier and Hinrichs render the jury verdict irrational.  Because Recasner failed to renew his motion for acquittal at the close of evidence, this court reviews the jury verdict for plain error. United States v. Barton, 257 F.3d 433, 439 (5th Cir. 2001).  On review for plain error, "a conviction may be reversed only to avoid a manifest miscarriage of justice .... Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or ... because the evidence on a key element of the offense was so tenuous that a conviction would be shocking."  Id. (internal quotation and citations omitted).

As to Count One, the government was required to prove four elements beyond a reasonable doubt, including Recasner's (1) knowing, (2) possession of a controlled substance,

11

(3) containing over fifty grams of cocaine base, and (4) with intent to distribute. See 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii). As to Count Two, the government was required to prove Recasner's (1) knowing, (2) possession of a controlled substance (cocaine hydrochloride), (3) with intent to distribute. See 21 U.S.C. § 841(a)(1). At trial, the government presented essentially the same testimony by Ferrier and Hinrichs that was presented to the district court in opposition to Recasner's motion to suppress -- including, Ferrier's description of witnessing a drug transaction involving Recasner, Hinrich's description of the information relayed to him by Ferrier, Hinrichs's description of his search of Recasner's vehicle, and Hinrichs's description of seizing the Foot Action bag with cocaine inside. See supra Part II. The jury likewise heard essentially the same contradictory testimony by Recasner and his two defense witnesses, Carter and Elder, that was presented to the district court in support of his motion to suppress. See id. Elder additionally testified, however, that he never saw any officers remove any items from Recasner's Buick. Recasner additionally testified that he had never seen the Foot Action bag until the trial, that he never possessed any cocaine, that he never saw any of the officers remove anything from his vehicle while searching it, and that no officer placed anything in the trunk of the NOPD vehicle in which Recasner was placed.

12

In addition, the jury heard testimony by a Drug Enforcement Agency ("DEA") forensic chemist, Cheryl White, that the cocaine taken from the Foot Action bag included sixty-one grams of cocaine base and seventy grams of cocaine hydrochloride. The jury was entitled to infer intent to distribute from the quantity of controlled substance seized. See, e.g., United States v. Sanchez, 961 F.2d 1169, 1176 (5th Cir. 1992). Moreover, a DEA expert in drug trafficking, Chris Ortiz, testified that the amount of cocaine seized and the presence of the plastic sandwich bags, which he testified are commonly used for packaging narcotics for sale, indicated in his opinion that the cocaine was intended for distribution. Thus, the government offered evidence to the jury that establishes all of the elements of both counts with which Recasner was charged.

The jury was entitled to weigh all of the testimony offered by both the government and defense witnesses and to choose to credit witnesses for the government, despite any defense testimony to the contrary. See, e.g., Greenwood v. Societe Francaise De, 111 F.3d 1239, 1251 (5th Cir. 1997). Viewing the evidence in the light most favorable to the verdict, this court cannot say that the record is devoid of evidence supporting the verdict or that the government evidence is so tenuous as to render Recasner's conviction either shocking or a manifest miscarriage of justice. Consequently, the jury did not plainly err in convicting Recasner for two counts of cocaine possession.

13

## V. MOTION FOR MISTRIAL

Recasner contends that the district court erred in denying his motion for mistrial based on the inadvertent introduction of a receipt, which was not in evidence, into the jury room. Recasner further contends that it was an abuse of discretion for the district court not to give a curative instruction to the jury regarding the receipt. The receipt was found by jurors at the bottom of the Foot Action Bag and given by those jurors to a court officer who then told them that the receipt was not evidence and was to be "disregard[ed]." At Recasner's request, the district court refrained from instructing the jury specifically that the receipt was not to be considered by them. Recasner indicated that he did not want the court to call attention to the receipt and thus possibly induce the jurors to improperly consider the receipt in their deliberations. The district court had already instructed the jury not to consider any material not properly introduced as evidence at trial by testimony or as an exhibit. In denying Recasner's motion, the district court determined that the receipt was not prejudicial to Recasner because the receipt failed to denote any transaction and designated its origin as New Mexico, not Texas where Recasner was arrested. Thus, the district court found that the receipt appeared wholly unrelated to Recasner and the drug transaction at issue.

14

We review the district court's denial of the motion for mistrial and any claimed evidentiary error for abuse of discretion.  See United States v. Honer, 225 F.3d 549, 555 (5th Cir. 2000) (denial of motion for mistrial) (citation omitted); United States v. Sanchez-Sotelo, 8 F.3d 202, 210-11 (5th Cir. 1993) (evidentiary errors).  Recasner is correct that a defendant is entitled to a new trial when "extrinsic evidence is introduced into the jury room 'unless there is no reasonable possibility that the jury's verdict was influenced by the material that improperly came before it'" and that the government bears the burden of "proving the harmlessness of the breach."  United States v. Luffred, 911 F.2d 1011, 1014 (5th Cir. 1990) (quoting Llewellyn v. Stynchcombe, 609 F.2d 194, 195 (5th Cir. 1980)) (citation omitted).  However, this court affords "great weight to the trial court's finding that the evidence in no way interfered with any juror's decision."  United States v. O'Keefe, 722 F.2d 1175, 1179 (5th Cir. 1983) (citation omitted).  There is no evidence that the receipt is linked to Recasner in any way, that the jury considered the receipt valuable to its deliberations, or that the receipt is strongly probative of Recasner's guilt in light of the other evidence offered against Recasner.  The district court did not abuse its discretion, therefore, in denying Recasner's motion for mistrial based on the inadvertent introduction of the receipt into the jury room.

## VI.  CONCLUSION

For the foregoing reasons, the district court's judgment of conviction and sentence are AFFIRMED.