**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Clarence CHANCEY, a/k/a Sonny,
Defendant-Appellant.**

**No. 82–5363.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 19, 1983.

---

Mark P. Bryan, Federal Public Defender (Court appointed), Robert W. Knight, Tampa, Fla., for defendant-appellant.

Judy Schropp Hoyer, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and COLEMAN *, Senior Circuit Judge.

COLEMAN, Senior Circuit Judge:

## I

The indictment charged that Clarence Chancey, on September 19, 1981, in Tampa, Florida, willfully, knowingly, and unlawfully did seize, confine, inveigle, kidnap, abduct, and carry away Tamara Kay Goshern and did willfully transport her in interstate commerce from Tampa to the State of California, all in violation of 18 U.S.C., § 1201(a)(1). After deliberations which ended at 4:35 A.M. the verdict was "guilty as charged". Chancey was sentenced to imprisonment for fifteen years. Motions for a directed verdict of not guilty and for judgment of acquittal were denied. This appeal followed, and we heard oral argument in Atlanta.

The record shows that Tammy Goshern was a high school dropout. The record also shows that Chancey had previously been convicted of auto theft, escape from a county jail, burglary of an automobile, and arson. He had served five years in prison and had been released the immediately preceding July 14, about sixty days before the alleged kidnapping. With this kind of record, the jury must have sized him up as a highly unsavory character who stood badly in need of attending to, for it was undisputed that he had transported a seventeen year old girl on a transcontinental copulation spree.

There was no third party witness to the alleged seizure and abduction of the complaining witness. She testified that she was five feet, eight inches tall, and weighed 109 pounds. On the night of September 18, 1981, she was visiting in the home of her sister and had been out with her boyfriend, who had left the house about 12:30 A.M. She then retired to a couch to sleep but awoke about 4:00 o'clock with a hand over her face and was told by a man that she had never seen before that if she made any noise she would get her head blown off. She said that the attacker asked her who else was in the house and told her that if she made any noise he would kill them, he would "shoot 'em". He told Tammy to go outside with him, she did not resist because she was "too scared". She left the house in her nightgown and they walked over to Club 92, where she was put in the defendant's car. She said Chancey told her that "his boss told him that he was supposed to get Carol and take her to him". After awhile he stopped the car and locked her in the trunk. In the meantime, she had been given a T-shirt to wear instead of the nightgown. After a time, he let her out of the trunk, put her back in the car, and gave her a pair of shorts to wear. He stopped at a filling station to get cokes and cigarettes but she made no effort to escape because she "was too scared". He then went to another filling station, which was not open, and made a phone call at which time he told the person on the other end of the line "that he got the wrong girl". The "wrong girl" was not released and they took off again, after which Chancey told her that he had to kill her. She cried and begged him not to do so, and he then said that "the only way he could get out of it is if we left". Further, he told her that if he released her "there would be people waiting for me and they would kill me before I even got to the door". Furthermore, if he released her "they would kill him".

It is about 165 miles from Tampa to Lake City, Florida. There, according to the testi-

---

* Honorable James P. Coleman, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-tion.

mony of the alleged victim, elicited by the government, things became more amicable. According to Tammy, she and the defendant went to a campground. There were other people around but she made no outcry and asked for no assistance. She made no effort to get away. Hand in hand with Chancey she walked around the park area, she rode him piggyback, she played with the tadpoles in a pond, and soon wound up having sex with Chancey on the backseat of his automobile. He used no force to attain his objective but told her that she should do it out of gratitude "for what he had done for her". She made a telephone call to her parents but said that Chancey would not allow her to tell them her whereabouts. She admitted that she told her parents "that I just left".

While they were in the vicinity of Lake City Tammy picked out a dress at a K-Mart store and Chancey stole it for her. There were a lot of people around, including salespersons, but Tammy made no effort to let these people know that she was being kidnapped, because she was "too scared". However, she was not too scared to participate in the theft of the dress or to accept it after it was stolen.

After leaving Lake City, Chancey and Tammy drove to Pensacola, a distance of about 260 miles. No state line was crossed. When they got to Pensacola they found a Phillips 66 gasoline station, for which Chancey had a stolen credit card, but it was closed, so the couple spent the night in the car on the beach. While there, Chancey went in a bar while she remained outside in the automobile. There were people going in and out of the bar but she made no effort to inform them of her situation or to get away even though Chancey had left the keys in the car. When he came out of the bar *she* drove the car back to the beach.

The next day, the filling station was still closed so Chancey went to a neighboring house to find out when the station would open, leaving her in the automobile, but again she made no effort to get away.

The remainder of that day was spent in Pensacola, while the alleged kidnapper and his alleged victim were walking hand in hand on the beach and "having a good time". At no time did she try to get away. During the stay in Pensacola Miss Goshern had sex with Chancey but declined to state the number of times.

The filling station was open Monday morning. Chancey went inside the service station while buying gasoline with his stolen 66 card, and she made no effort to raise the alarm or to get away.

Although she had no driver's license, when the pair left Pensacola Tammy was doing the driving.

On one occasion, on the trip to California, they helped a man with a flat tire, who allowed them both to go to his house to use the shower. While Chancey took a shower Tammy visited with their host and he played his guitar for her. She made no mention of being detained against her will.

On another occasion, on the trip, Tammy and Chancey stopped to pick up a man who was out of gas on the side of the interstate highway. They took him to a gas station. He then took them to a restaurant, where they remained three hours and Chancey got drunk. She said nothing to the man they picked up, nor to anyone in the restaurant.

Once during the trip she went into a laundromat to wash and dry their clothing while Chancey sat naked in the car. She used the laundromat for about thirty minutes, there were other people around, but she made no effort to obtain help or to inform anyone that she was being detained against her will.

In Santa Monica, California, they went to the boardwalk and walked around where there were a lot of people present. Tammy made no effort to get away because, as she said, she did not know where she was.

She recalled one time going to the 76 service station by herself, parking her car on the west side of the building and using the restroom. Chancey was on the beach. She made no request for help and told no one that she was being kidnapped.

Once in California they got lost, stopped at a doughnut shop to ask for directions, which Chancey obtained from *a police officer*. Again, no cry for help or effort to escape. Tammy said she did not ask for the police officer's help because "I was scared". She admitted that while they were on the beach in California there were plenty of people around, but no request for assistance.

The jury must have found it considerably difficult to accept this bizarre evidence as proof beyond a reasonable doubt of an involuntary transportation. At 3:57 P.M. the jury retired to consider its verdict. At 12:32 past midnight the trial court, outside the presence of the still deliberating jury, stated to counsel that he had received a message from the jury that "at this point it seems that we are unable to reach a decision. We would like for you to clarify the term 'reasonable doubt' if at all possible".

In the absence of objection, the Court gave further instructions on the meaning of reasonable doubt and the jury returned to its deliberations at 12:45 A.M. At 4:35 A.M., the jury informed the Court that it had reached a verdict, which was "guilty".

Chancey took the witness stand in his own behalf. He testified that he knew Tammy before they departed for California and had sexual intercourse with her at his mother's home. He said that the trip to California and all incidents relative thereto were wholly voluntary on her part. The jury, of course, could reject this testimony but that does not end inquiry as to the inherent improbabilities so glaringly present at every turn of the young woman's testimony, the truth of which was indispensably necessary to the government's case, i.e., proof beyond a reasonable doubt of involuntary transportation in interstate commerce.

## II

■ Credibility issues are for the determination of the jury. However, defendants may not be convicted if the evidence is insufficient to persuade a rational factfinder beyond a reasonable doubt that the de-

fendant is guilty, *see, e.g., Davis v. United States,* 160 U.S. 469, 493, 16 S.Ct. 353, 360, 40 L.Ed. 499 (1895); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652 (1982).

■ After analyzing the evidence in the light most favorable to conviction a directed verdict of acquittal is required if no reasonably minded jury (rational factfinder) could believe from that evidence beyond a reasonable doubt that the defendant is, in fact, guilty.

■ To sustain a conviction for a violation of 18 U.S.C., § 1201(a)(1) the government must establish beyond a reasonable doubt a transportation in interstate commerce of an *unconsenting* person being held for ransom or reward or otherwise, and such acts must be knowingly and willfully done, *Hattaway v. United States,* 399 F.2d 431 (5 Cir., 1968); *United States v. McBryar,* 553 F.2d 433 (5 Cir., 1977), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136. To be exactly specific, if the interstate transportation is by consent there is no case.

In denying the defense motion for an acquittal at the close of the government's case in chief, the trial court observed:

"In this case if the jury should credit the testimony of the alleged victim, Tamara Goshern, her testimony would obviously contain all of the essential elements of the alleged offense. It seems to me, if there was ever a case for the jury, this is one."

As far as it goes, this statement is undoubtedly correct. It does not address the problem, however, which arises when the testimony credited by the jury is so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt. The mere fact that the testimony is in the record is not enough. If a witness were to testify that he ran a mile in a minute, that could not be accepted, even if undisputed.

If one testified, without dispute, that he walked for an hour through a heavy rain. but none of it fell on him, there would be no believers.

### III

Miss Tamara Kay Goshern is the sole witness to lack of consent. Regardless of what she says, her every *act* and *deed,* as she described them, shout that when she drove the car across the Florida state line she did it voluntarily. And the same is true from Florida all the way to California and after the travelers arrived there.

The undisputed proof shows that she had often driven her parents' car, with their permission, when she had no driver's license. She had often used her steady boyfriend's car without his knowledge or consent. She had worked at Wendy's, where, of course, she was in constant contact with and dealing with the public. The record is replete with claimed lack of knowledge or loss of memory when she was questioned about matters damaging to her contention of involuntariness. There was no proof of any mental impairment or physical handicap that would have rendered her incapable of calling for help or escaping at the first opportunity, and there was a wealth of opportunities before the parties ever left Florida, much less afterwards. On the contrary, we find her participating in unresisting sexual intercourse on the first day of her alleged abduction, and nobody knows how many times afterwards.

■ We cannot escape noticing that walking hand in hand in the presence of others, riding piggyback in a public place, declining to take advantage of any number of golden opportunities to ask for help or escape, including not a word in the presence of a policeman, as evidenced by her own testimony, simply cannot pass muster in the reasonable mind that an individual is being detained and transported against his or her will.

### IV

We have no problem in deducing from this record, and from oral argument, that the prosecution must have had its qualms about transforming what ordinarily would have been a statutory rape case or possibly an open and shut Mann Act case into an interstate kidnapping case. It tried to shore up the incredible claim of voluntariness by calling a psychiatrist in rebuttal to defense testimony.

Dr. Ochberg is a board certified psychiatrist, having obtained degrees from Harvard and John Hopkins, and completed a residency in psychiatry at Stanford. He had traveled around the world doing work with *ex-hostages.* As a result, he had originated the term "Stockholm Syndrome" in medical literature. He described the "Stockholm Syndrome" as a psychological phenomenon whereby a hostage develops positive feelings for his or her captor. He said that the theory was ten years old and in the developmental stage, but was accepted by a large percentage of psychiatrists who had been introduced to it. Dr. Ochberg had spent a large percentage of his time with this specialty in the past, in connection with terrorism and the Iranian crisis, but had spent more time in other areas during the past two years.

Dr. Ochberg had never examined Miss Goshern personally. He had read various official reports, her grand jury testimony, and a transcript of her trial testimony. He offered the opinion that if her testimony was truthful, that is, that she had been, in effect, held hostage, then the "Stockholm Syndrome" would be the best explanation for resistance to asking for help or escaping when she had the opportunity to do so.

The Court then propounded the following question:

"Going back to your last answer, Doctor, I take it that you have not seen or developed sufficient information in this case to enable you to render a professional diagnosis with respect to the *mental* or *emotional* condition of the alleged victim in this case *at any time?*" (emphasis added)

To this the witness answered:

"That is true, Your Honor."

The appellant complains vigorously of the admission of this kind of testimony for the consideration of the jury. Since we are of the opinion that no rational factfinder would believe from the evidence beyond a reasonable doubt that Tammy was being held hostage (detained against her will) when she drove the defendant's car out of Florida, or at any time thereafter, we need not belabor or decide this point.

The same is true as to the other points raised by the appellant in his briefs and at oral argument.

### Conclusion

Since we are left with an abiding conviction that no rational factfinder could have believed from the evidence in this case beyond a reasonable doubt that the alleged victim was transported involuntarily in interstate commerce, we reverse this conviction.

The case is remanded to the District Court to enter a judgment of acquittal.

REVERSED and REMANDED.