# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

DONALD HARRY CARMONA, a/k/a
Harry Donald Carmona, a/k/a Lou
Morales, a/k/a Robert Montoya,
a/k/a Franco Hernandez, a/k/a Gary
De Los Santos, a/k/a Henry Donald
Carmone, a/k/a Henry Donald
Carbone, a/k/a Vince Carlucci,
          *Defendant-Appellant.*

No. 01-4309

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CR-00-22)

Argued: May 7, 2002

Decided: June 6, 2002

Before WILKINSON, Chief Judge, and NIEMEYER and
LUTTIG, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Luttig wrote the opinion, in
which Chief Circuit Judge Wilkinson and Judge Niemeyer joined.

---

## COUNSEL

**ARGUED:** David Bruce Freedman, WHITE & CRUMPLER,
Winston-Salem, North Carolina, for Appellant. Lawrence Patrick

Auld, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Paul A. Weinman, Assistant United States Attorney, Greensboro, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

LUTTIG, Circuit Judge:

Donald Harry Carmona tricked his victim into taking a trip from North Carolina to Ohio, where he raped her numerous times. A jury convicted him of, *inter alia*, kidnaping, in violation of 18 U.S.C. § 1201, and violation of the Mann Act, 18 U.S.C. § 2422(a). Carmona appeals, challenging the sufficiency of the evidence used to convict him.

### I.

The victim of Carmona is Sara DuSablon, who was 20 years old in 1999, when the crime was committed. The facts, which are quite peculiar, come mostly from her testimony; Carmona did not take the stand.

In 1999, DuSablon was a junior at Duke University. She was raised in rural North Carolina, in a devoutly Catholic, French-speaking home, with nine younger siblings. She was home-schooled, did not date, use a computer, or watch television.

At some point during her studies at Duke, she "discovered" internet chat rooms. In October, 1999, she began corresponding with "Henry Carmone" (Carmona). Henry described himself as a 24-year-old, employed as a Special Agent with the United States Secret Service, working mainly on counterfeit and drug cases. Henry and DuSablon

started exchanging e-mails; in his messages, Henry often described his "work." Henry also apparently professed a desire to have a large family, striking the right chord with DuSablon, who herself is very fond of children. Eventually, Henry confessed to have fallen in love with DuSablon. He also asked her to send him pictures of herself; she complied by sending a nude picture.

DuSablon's friends and roommate cautioned her against involvement with Henry, whose stories they found unbelievable. To quell any doubts, DuSablon then called the Charleston Secret Service Office, asking to speak with Special Agent Carmone. Remarkably, the operator responded that Carmone was not there, but could be reached at the number he left. As it turns out, Henry had contacted the Secret Service Office and, representing himself as an agent, left a message with the operator for DuSablon. When DuSablon called the provided number, Henry answered. That, for DuSablon, not surprisingly, confirmed Carmone's story.

In November of 1999, DuSablon agreed to meet Henry at Duke. When she saw Henry, who came by her apartment one morning, she was quite shocked — he was significantly older than 24, smelled, was shabby in appearance, short, and overweight. Henry insisted, however, that she should stay in bed while he made her breakfast. After eating what he cooked, she felt "lethargic" and "blurry." J.A. 167-68. Henry then made some advances, which resulted in some sexual contact. DuSablon then told Henry that she was not attracted to him, but he continued to profess his love for her. He also expressed his desire to take care of her including financially, claiming that he had a large inheritance, which was currently tied up in court.

Henry spent the rest of the weekend with DuSablon, sleeping on the couch in her dorm room, although prior to his visit, he had promised to stay in a motel. Henry told DuSablon and her roommate countless stories of "undercover" work and showed them some self-defense tricks, which he allegedly learned in the Secret Service. Henry also asked DuSablon about her worst fears; she confessed that she was afraid of being tied up, hit, suffocated, and raped. Henry responded that he was taught in the Secret Service that one must face one's fears to overcome them.

After he left, Henry and DuSablon continued their correspondence. At some point, Henry told DuSablon about a family of drug dealers and their six-year-old daughter, Samantha, who had been sexually abused. After Thanksgiving, Henry disclosed to DuSablon that he needed to travel in connection with this case. He then announced that both Samantha's parents had been killed, but that the mother voiced a dying wish that DuSablon take care of Samantha. Because of DuSablon's involvement in this case, Henry cautioned DuSablon that other Secret Service men watched her; she also received some e-mails from them, which included stories of Henry's heroism and love for DuSablon.

Henry then made arrangements for DuSablon to correspond by e-mail with Samantha. DuSablon became so attached to Samantha, that upon researching applicable law, she decided to adopt her. Henry told DuSablon that because of his position as a Secret Service agent, he would be able to help her with the adoption.

Henry visited Duke again in December; he began teaching DuSablon how to face her fears, by tying her up, striking her, and simulating rape.

By that time, DuSablon was determined to adopt Samantha and planned to go see her in Ohio, where Samantha allegedly resided. However, Henry insisted on coming along; he warned DuSablon that she would not be able to see the girl, who was in a safe house, without him. As DuSablon testified, it was her voluntary choice to go on a plane to Ohio, but her motivation was to see Samantha, whom, by that time, she considered to be her daughter. J.A. 485.

Because of the alleged difficulties with Henry's inheritance, DuSablon bought tickets for both of them. They arrived in Columbus on December 15. In response to DuSablon's persistent requests to see Samantha, Henry, after making excuses for two days, announced on December 17 that Samantha had accidentally shot herself with a gun. Henry added that Samantha wanted DuSablon to commit suicide so they would be together in heaven.

Throughout their stay, DuSablon felt drowsy, similarly to how she felt after Henry fed her when he first arrived to Duke. She experi-

enced similar sensations when she was given a prescription sedative in the hospital after the ordeal was over. Henry raped her several times; because of her impaired physical and mental state, she could not resist.

He persistently suggested that she should commit suicide. He gave her sleeping pills, which he made her throw up because he had not had sufficient time to enjoy her sexually. He made her walk outside in wet clothes; injected some salt solution into her arm; placed a plastic bag over her head so that she could not breathe; all in an effort to help her commit suicide.

He also warned her that Secret Service agents were watching her home and her family. DuSablon testified that she feared that even if she could escape, she and her family would be in danger. J.A. 326, 503. Throughout the trip, she felt disoriented; several people testified that she appeared to be on some kind of drug, unhygienic, and scared.

At some point, Henry called DuSablon's parents, asking them to wire money. They refused. They then alerted the police and traveled to Columbus, where they found their daughter. Later, Henry was arrested.

As DuSablon found out, Henry is actually a 45-year-old homeless man, who at one point worked as an informant, but had no association with the Secret Service at the time he met DuSablon. Samantha and her family were fictions, as were the other Secret Service agents from whom DuSablon received e-mails.

## II.

The kidnaping statute, 18 U.S.C. § 1201, authorizes punishment for whoever "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person" when "the person is willfully transported in interstate . . . commerce."

The Mann Act, 18 U.S.C. § 2422(a), authorizes punishment for whoever "knowingly transports any individual in interstate . . . com-

merce . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense." On this charge, the government argued that Carmona caused DuSablon to travel across state lines with the purpose of raping her, in violation of Ohio law.

Carmona contends that no rational jury could have found violations of either the kidnaping statute or the Mann act, because, he argues, DuSablon consented to the trip and to the sexual relations. Appellant's Br. at 23 ("Ms. DuSablon was, albeit ill-advisedly, both an initiator and participant in this sad tale."). In fact, he claims that because his stories were so unbelievable, she could not have accepted them at face value and thus, was a willing participant in their activities and travels. *Id.* at 28.

### A.

Upon reviewing the testimony of DuSablon and those who observed her and Carmona at Duke and in Ohio, we conclude that there was sufficient evidence to convict Carmona of kidnaping. He inveigled DuSablon into traveling to Ohio by inventing stories about his occupation and about a girl in need of a loving parent. Carmona made DuSablon believe that traveling across state lines would enable her to see that girl and adopt her. And, he tricked DuSablon, drugged her, threatened her, and manipulated her with the purpose of controlling her for his sexual and financial benefit. Carmona's "induced misapprehension of his intent negates the contention that [DuSablon] [departed on a trip to Ohio] willingly." *United States* v. *Hughes*, 716 F.2d 234, 237 n.5 (4th Cir. 1983)(affirming a kidnaping conviction where the defendant misled the victim as to the purpose and destination of the trip across state lines). Carmona induced DuSablon to believe that they were going to Ohio to see Samantha; "knowing that [DuSablon's] belief as to their purpose . . . [wa]s different from his actual illicit purpose" of sexual exploitation and financial enrichment, Carmona "interfered with, and exercised control over, her actions." *Id.* at 239.

Carmona's contentions notwithstanding, that DuSablon did not seek help of the clergy when she visited a church in Ohio or of policemen does not undermine the reasonableness of the conclusion that she

was kidnaped, given her unrebutted testimony that she feared for her family's safety. *See United States* v. *Childress*, 26 F.3d 498, 502 (4th Cir. 1994) (failure to seize upon arguable opportunities to escape does not render the transportation across state lines consensual where the defendant forcibly took and transported the victim in his car, continuously threatening to kill her).

Carmona also seeks to establish consent to the trip and the ensuing sex and torture from the fact that he and DuSablon had consensual sexual relations when he first visited her at Duke. However, to prevail, Carmona needs to show that it was unreasonable for any fact finder to conclude that prior consent did not establish valid consent nearly two months later. That he did not do. Moreover, the jury could have concluded that Carmona drugged DuSablon during their first encounter as well.

Carmona points to testimony given by those who had seen them in Ohio regarding displays of affection between himself and DuSablon. J.A. 658 (testimony by the witness that he saw them holding hands but not kissing). However, other testimony given by DuSablon and other witnesses indicated that DuSablon appeared to be on drugs and disoriented, and thus unable to consent in any meaningful sense.

Finally, "the monumental credulity" DuSablon displayed is of no consequence, *see United States* v. *Neiswender*, 590 F.2d 1269, 1275 (4th Cir. 1979); that she unreasonably, though honestly, relied on his misrepresentations is not a defense to a kidnaping charge.

Carmona's reliance on *United States* v. *Chancey*, 715 F.2d 543 (11th Cir. 1983) (reversing a federal kidnaping conviction due to insufficiency of the evidence), is misplaced. Although initially taken by force, by the time the victim in *Chancey* was transported across state lines several days after being abducted, she was clearly enjoying the defendant's company, both in public and in private. At trial, her testimony was "replete with claimed lack of knowledge or loss of memory when she was questioned about matters damaging to her contention of involuntariness." *Id*. at 547. In the case *sub judice*, given the unwavering testimony by DuSablon, the jury could have reasonably concluded that she labored under a misconception of Henry's identity and was sincerely hoping to adopt Samantha.

Accordingly, we are satisfied that we can answer the question of "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of [kidnaping] beyond a reasonable doubt," *Hughes*, 716 F.2d at 239 (internal citations omitted), in the affirmative.

## B.

The evidence also supports the jury's verdict with respect to the Mann Act. Carmona knowingly caused DuSablon to travel to Ohio with the intent of engaging in unlawful sexual conduct. Carmona's contention that no unlawful sexual conduct occurred is not credible, for the only support he marshals is DuSablon's initial statement to the police that she was not raped. However, as revealed by her testimony, she believed at the time of the initial questioning that one is not raped unless one actually says "no." But, more importantly, Carmona did not carry the heavy burden of proving that no rational fact finder could have concluded that the purpose of the trip was to take advantage of DuSablon sexually.*

## *CONCLUSION*

For the reasons stated herein, we affirm the judgment of the district court.

*AFFIRMED*

---

*We reject the remaining challenges to certain evidentiary rulings, jury instructions and sentencing calculations as meritless.