[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13369

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARQUES DEON JONES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:22-cr-14069-AMC-1

_____

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

PER CURIAM:

Marques Deon Jones was convicted of firearms-possession offenses and one count of kidnapping.  This appeal concerns the kidnapping charge.  Jones contends that the evidence was insufficient to prove that he kidnapped the victim, and that the district court erred in denying his motion for judgment of acquittal.  In Jones's view, the victim—P.G.—consented to going with him, so insufficient evidence supported a kidnapping conviction.  Jones also argues that he didn't derive any benefit from the kidnapping.

Though Jones's interpretation is one view of the evidence, a reasonable jury also could have found beyond reasonable doubt that Jones (a) took P.G. against her will and (b) received a benefit from doing so.  So we affirm the district court's judgment.

## I.    BACKGROUND

Jones was charged with six counts—three involving firearms-possession offenses, two on assaulting a federal officer, and one count of kidnapping under 18 U.S.C. § 1201(a)(1).

The jury heard from several witnesses at trial.  The first was Petal Ryan.  Ryan testified that in August 2022, P.G. was working at the Arc, a group home for people with developmental disabilities.  Ryan was P.G.'s supervisor.  Ryan testified about the events of the early hours of August 14, 2022.  When she was asleep and P.G. was on her phone, they heard a knock on the door.  When

Ryan asked P.G. if she knew who it was, P.G. replied that she thought it was "the guy [she] told [Ryan] about" the day before. P.G. went to the bathroom, and Ryan spoke to the man through the door. The man, later identified as Jones, asked to speak with P.G. Ryan said P.G. was in the bathroom. Jones said it was "an emergency."

When P.G. came out of the bathroom, she went outside to speak with Jones. Ryan overheard Jones cuss at P.G. and ask whether she was "going to stop playing with" him. Next, Ryan heard Jones hitting P.G., and she went outside and saw him "in full attack [*sic*] at that point." Jones held P.G. up against the wall, "talking to her, hitting her at the same time." Jones held a gun in one hand, pinning P.G. against the wall with the other.

Ryan told Jones that there were cameras around, and that he couldn't "do this here" and "need[ed] to take [it] down the street . . . ." Jones kept telling P.G. to "stop playing with him . . . ." According to Ryan, P.G. didn't seem "free to leave" and "didn't try to leave," "just standing there with . . . a blank stare." Jones accused P.G. of not being at work earlier that day, but Ryan insisted P.G. was at work all day. When Ryan realized Jones was holding a gun, she went inside and locked the door.

Once inside, Ryan overheard Jones hitting P.G. again, cussing at her, and telling her to "get in the car." Ryan heard Jones saying to P.G., "I will kill you, I will kill me." Then P.G. got into the car's passenger's side, and the two of them drove away. At the time, P.G.'s shift wasn't over yet; she hadn't clocked out; didn't

pick up her phone, purse, or other belongings; and didn't tell Ryan whether she'd return. Ryan said that P.G. looked scared, and Ryan felt scared for P.G.'s wellbeing. So Ryan called 911.

The jury next heard from Officer Carson Perkins. He responded to Ryan's 911 call. When he arrived at the Arc, he spoke to Ryan, who seemed "afraid." So he went to find P.G. Ryan gave Officer Perkins P.G.'s cell phone. P.G. called that phone, "very distressed" and in tears. Officer Perkins pinged P.G.'s phone's location, which turned out to be near P.G.'s home address. After about twenty minutes passed, P.G. called the phone again. She said she was on her way back to the Arc and would be there soon. When she returned, she appeared "[v]ery distraught, upset, in shock," and she told Officer Perkins that she feared for her life.

Officer Perkins's body camera showed P.G.'s conversation with him once she'd returned to the Arc. The video showed P.G. saying that she and her boyfriend "got into it" when he came to her work and began to fight her, while wielding a firearm. She told the officer that Jones had been calling her repeatedly, and then he came to her work and told her, "Get in the car, let's go." When Officer Perkins asked P.G. whether she went into the car freely, P.G. replied "no." When asked whether Jones had taken her against her will, P.G. said, "right." Officer Perkins asked P.G. if she'd feared for her life. P.G. tossed up her hand and stated that Jones "had got a gun to [her] face." As she described it to Officer Perkins, P.G. "was just trying to get [Jones] to calm down," because she "didn't want him to shoot [her]."

Beyond the body-camera footage, the jury also watched surveillance footage of the incident. It showed what appeared to be P.G. and Jones getting into the car, and Ryan stated that it looked like the man was "waving something in [P.G.'s] face" in the video. Officer Perkins testified that it looked like the object Jones was "flash[ing]" at P.G. was a firearm.

Next, P.G. took the stand. She said Jones had been staying with her earlier, but on the day of the incident she'd taken Jones to a motel because they'd gotten into an argument. The problem seemed to be that Jones kept calling P.G. late at night, and she refused to answer. Eventually, Jones showed up at the Arc to talk. According to P.G., Jones had come by that day because she hadn't spoken with him earlier.

As P.G. described the incident, Jones showed up "high out of his mind;" and in an attempt to calm him down, she told him "let's go." P.G. stated she was the first to say they should leave and take it somewhere else. Although P.G.'s shift wasn't over yet, she said she left with Jones to calm him down and take their argument away from work. She said that Jones "roughed [her] up," "push[ing] [her] to the wall" such that her wig fell off. But Jones didn't hit her with his fists. P.G. said she wasn't scared. Still, her headwrap and wig had fallen off, and an AirPod fell out of her ear in the scuffle. She said she'd waved her arms, trying to get Jones to stop. P.G. remembered Jones waving the gun in her face, but denied that he said he'd kill her. P.G. remembered Jones saying he'd kill himself, but dismissed it as him being "just high."

After they'd driven away, P.G. said she didn't know where Jones was taking them, and Jones was "all over the place," so she told him to pull over and let her drive. He did. With the gun now at his side, Jones told P.G., "If the police get behind us, I'm going to kill you. I'm going to kill myself. I'm going to make them kill me." P.G. said she wasn't afraid at the time, and that she drove Jones to her house so she could drop him off and return to work. When they got there, P.G. asked Jones not to go in the house because her kids were asleep. Jones got out of the car without incident.

Realizing P.G. had left her phone at work, P.G. called it from Jones's phone. Ryan called Jones's phone back from P.G.'s phone. P.G. answered, saying she was "okay" and on her way back to work.

The government admitted a photograph showing a red mark on P.G.'s face. When asked about it, P.G. said she didn't know she even had the scratch, and that she didn't think Jones would hurt her. She insisted that Jones "didn't make" her get into the car, "didn't force" her; she did so because she was "just trying to diffuse the situation." P.G. emphasized that she wanted to "take this away from the job," because there's "a time and place for everything, and that definitely wasn't the place." So she said that was why she got into the car with Jones, even though her shift wasn't over yet. And when the government asked whether Jones "got what he wanted" by showing up and talking with her, P.G. replied, "I guess, yeah." When asked whether, in leaving with Jones, P.G.

gave Jones "the reassurance that [she wasn't] with anyone else," she replied, "[y]es."

After the government rested, Jones moved for a judgment of acquittal on the kidnapping count. Counsel argued that it was P.G.'s idea to leave, to calm him down and have their chat away from work; and that Jones didn't demand anything of P.G. once she got into the car with him. The government replied that P.G. said she hadn't intended to leave work early that day and did so only because of Jones's actions. So the government argued that P.G. "left under coercion" and "under threat," with Jones saying he'd kill her; and that the "benefit" Jones got from doing this was "the opportunity to speak with [P.G.] once she left" the Arc.

Upon hearing this, the district court denied Jones's motion, without further explanation.

The jury found Jones guilty of the kidnapping charge, as well as two of the firearms-possession charges. Jones timely appealed.

## II.    DISCUSSION

We review de novo Jones's challenge to the sufficiency of the evidence. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015). We also review de novo the district court's denial of Jones's Rule 29 motion for judgment of acquittal. *Id.* In doing so, "'we view the evidence in the light most favorable to the government,' making all reasonable inferences and credibility choices in the government's favor, and then 'determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011).

*Id.* (quoting *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008)).  If the answer to that question is yes, we'll affirm.  *Id.*

This bar is a relatively low one.  "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial."  *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989).  "[I]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt."  *United States v. Clay*, 832 F.3d 1259, 1293–94 (11th Cir. 2016) (quoting *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006)).  "We will not overturn a jury's verdict if there is 'any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'"  *Id.* at 1294 (quoting *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015)).

Here, in viewing the evidence in the light most favorable to the government, we find that a reasonable jury could conclude that the evidence established Jones's guilt beyond a reasonable doubt.  *See id.*  The evidence showed each element of the kidnapping charge.  *See id.*  We explain below.

First, the elements.  Section 1201 punishes anyone who "unlawfully seizes, . . . kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, . . . when . . . the offender travels in interstate . . . commerce or uses . . . any means,

facility, or instrumentality of interstate . . . commerce in committing or in furtherance of" committing the offense.   18 U.S.C. § 1201(a)(1).   So to convict Jones under this statute, the government had to "establish beyond a reasonable doubt a transportation in interstate commerce of an *unconsenting* person being held for ransom or reward or otherwise, and such acts must be knowingly and willfully done." *United States v. Chancey*, 715 F.2d 543, 546 (11th Cir. 1983) (emphasis in original) (internal citations omitted).   This means that "if the interstate transportation is by consent there is no case." *Id.*

Jones asserts two arguments on appeal.   First, he contends that the victim, P.G., consented to going with Jones in the car.   Second, Jones asserts that he derived no benefit from taking P.G., so the "for ransom or reward or otherwise" requirement isn't satisfied.   *See* 18 U.S.C. § 1201(a)(1).[1]

Neither argument persuades us.   That's because in viewing the evidence in the light most favorable to the government—"making all reasonable inferences and credibility choices in [their] favor"—a reasonable jury could've found (1) that P.G. did not consent to Jones taking her away, and (2) that Jones derived a benefit from doing so.   *See Gamory*, 635 F.3d at 497.

To recap:   The evidence showed that Jones went to P.G.'s workplace late at night, cussing at P.G. and assaulting her, because

---

[1] Because Jones doesn't argue that any of the statute's remaining elements were unmet, we do not consider them here.

he was upset that P.G. (so he thought) wasn't at work earlier in the day and hadn't been responding to his calls. Jones "attack[ed]" P.G. while waving a gun in her face, pinning her against the wall, hitting her repeatedly, and telling her to "get in the car," all the while threatening (over and over again) to kill P.G. and himself. In going to the car with him, P.G. didn't pause to take any of her things with her, didn't tell Ryan if or when she'd return, and didn't clock out—even though her shift wasn't over yet. P.G. testified that she didn't intend to leave work that early and wouldn't have but for Jones's actions. Both Ryan and Officer Perkins testified that P.G. looked scared at the time. Officer Perkins said that P.G. sounded "very distressed" and was crying when she called Ryan after Jones had driven off with her. When P.G. came back, she appeared "[v]ery distraught, upset, in shock," and told Officer Perkins that she feared for her life. These facts could lead a reasonable jury to believe that Jones took P.G. away from the Arc with him against her will.

Although P.G. testified to a different version of events at trial, the jury didn't have to believe her. *See United States v. Chancey*, 715 F.2d 543, 546 (11th Cir. 1983) ("Credibility issues are for the determination of the jury."). Notably, P.G.'s story at trial also differed from the story she herself told law enforcement the day this all happened—as captured on Officer Perkins's body camera. P.G. told Officer Perkins that she didn't get into the car freely, said that Jones took her against her will, and emphasized that Jones had a gun in her face at the time. Even if P.G. was *also* (in her words) "just trying to get him to calm down," a "reasonable construction

of the evidence" would be that P.G. didn't get into that car consensually. *See Clay*, 832 F.3d at 1294.

A reasonable jury also could've found that Jones derived a benefit from taking P.G. It's a low bar to require that Jones took P.G. "for ransom or reward or otherwise," *see* 18 U.S.C. § 1201(a)(1), "as it merely requires that the captor seeks to 'secure some benefit to himself,'" *United States v. Gillis*, 938 F.3d 1181, 1210 n.25 (11th Cir. 2019) (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936)). The term "'[o]therwise' has been construed broadly to cover many sought benefits." *Id.* (collecting cases). For example, the kidnapping need not be done for a pecuniary motive, or for an "illegal purpose." *United States v. Adams*, 83 F.3d 1371, 1373 (11th Cir. 1996). For instance, committing a kidnapping merely for the purpose of "companionship" would satisfy this prong. *United States v. Lewis*, 115 F.3d 1531, 1536 (11th Cir. 1997). That's because "the prosecution need only establish that the defendant acted 'for *any* reason which would in *any* way be of benefit.'" *Id.* (quoting *United States v. Childress*, 26 F.3d 498, 503 (4th Cir. 1994)). Indeed, we've gone so far as to suggest that the word "'otherwise' comprehends any purpose at all." *Clinton v. United States*, 260 F.2d 824, 825 (5th Cir. 1958) (per curiam).[2]

Here, a reasonable construction of the evidence is that Jones, upset that P.G. would not talk to him, controlled her movement for the purposes of companionship or (as the government

---

[2] Fifth Circuit decisions issued before the close of business on September 30, 1981, are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

argued at trial) reassurance. He kept calling her at work, and when she didn't answer, he showed up there. P.G. agreed that the reason Jones came to her workplace was that she "didn't give him the time of day, . . . didn't talk to him;" and, when he was there, he "got what he wanted" by talking to her and getting the "reassurance" that she was not with anyone else. This is sufficient to support a kidnapping charge. *See Lewis*, 115 F.3d at 1536; *Clinton*, 260 F.2d at 825.

At bottom, it doesn't matter if Jones has put forward a "reasonable hypothesis of innocence," or some other version of how the day's events may have happened. *Clay*, 832 F.3d at 1293–94 (citation omitted). The question isn't whether the jury could've acquitted him, "but whether it reasonably could have found guilt beyond a reasonable doubt." *Id.* (citation omitted). On this record, the jury could've reasonably found Jones guilty of kidnapping beyond a reasonable doubt. It could've found that Jones took P.G. without her consent, and that he derived a benefit from doing so. So we affirm the judgment of the district court.

## III.    CONCLUSION

Because we find that a reasonable jury could have found Jones guilty of the kidnapping offense beyond a reasonable doubt, we affirm.

**AFFIRMED.**