# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3445

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Anthony Steven Wright, also known | * | |
| as Tony Zappa, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: March 13, 2003

Filed: August 26, 2003

_____

Before HANSEN,[1] Chief Judge, JOHN R. GIBSON, and LOKEN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

After a two-week trial, a jury found Anthony Steven Wright guilty of two federal offenses. He was convicted on Count I of kidnaping in violation of 18 U.S.C. § 1201 (2000) and on Count II of knowingly brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (2000). The district

_____

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

court[2] sentenced Wright to a term of life imprisonment on the kidnaping count and a term of seven years on the firearms count, with the two sentences to be served consecutively. On appeal, Wright argues that the evidence is insufficient to support his two convictions, that the district court erred by allowing inadmissible hearsay evidence, that the district court erred in failing to impanel a fair and impartial jury, and that the district court erred by sentencing him as a career offender. We affirm both Wright's conviction and sentence.

We recite the facts in the light most favorable to the jury's verdict. At approximately 7 p.m. on April 6, 2001, Wright approached seventeen-year-old Anne Sluti in the parking lot of the Hilltop Mall in Kearney, Nebraska. He pointed a gun at her and ordered her into his blue Suburban, which was parked next to her car. He grabbed her and pushed her into the driver's side of the Suburban. She slid across the seat and got out of the car on the passenger side, but Wright caught her and repeatedly hit her with his fists. As he pushed her back into the Suburban, she screamed for help, but he kept hitting her until she blacked out.[3] A number of people in the parking lot heard Sluti screaming and saw Wright beating her. Two of the witnesses called 911 on their cell phones. One of the callers, Janet Hadwiger, testified that she saw that "the front passenger door was open and that the girl was bracing herself to not go into that vehicle," that Wright hit Sluti "really hard," that he "just kept hitting her," maybe a "dozen" times. The other caller, Carrie Bran, stated that she heard "frightful" screaming and that when she turned to look, she saw a man

_____

[2]The Honorable Warren K. Urbom, United States Senior District Judge for the Eastern District of Nebraska.

[3]Wright stands six feet tall and weighs two hundred forty-seven pounds, and at one time was an aspiring boxer and the Minnesota State Golden Gloves champion.

hitting a girl and that he kept hitting her until he finally pushed her into the car and drove off.[4]

Upon receiving these emergency calls, Kearney police officer Michael Bogard arrived at the mall parking lot and found Sluti's belongings lying on the ground, including mittens, music CDs, and her purse, which contained her identification. Bogard contacted Sluti's parents and told them about the assault in the parking lot; Sluti's mother, Elaine Sluti, was able to confirm that the belongings left behind were in fact Anne's.

With Sluti lying on the floorboard, Wright traveled north from Kearney, Nebraska. At some point, Sluti came to and sat up in the seat. They arrived at a gas station in Ainsworth, Nebraska at approximately 10:15 p.m. Wright made Sluti get back on the floor of the Suburban. He used one chain to bind Sluti's hands behind her back and another chain to bind her feet and ordered her to remain on the floor and to be quiet. Wright went into the station and asked for directions. Brandon Doke, a customer at the station, spoke with Wright and looked outside and saw the Suburban but was unable to see anyone in the vehicle.

Wright continued to travel north from Ainsworth to Springview, Nebraska, which is thirteen miles from the South Dakota border. While driving down the road, he accidentally rolled the Suburban into a ditch. Wright wrapped a chain around one of Sluti's wrists, and they walked from the Suburban to a nearby farmhouse, where he cut the phone line and stole a pickup truck parked out front. He was not able to pull the Suburban out of the ditch with the pickup truck, so he drove into town with Sluti in the passenger seat of the pickup truck and stole a front-end loader, which

---

[4]Three other people confirmed the account of these two callers, testifying that they heard a girl's screams and saw a man deliver a number of blows to the girl until he finally forced her into the vehicle.

Wright used to get the Suburban out of the ditch. While Wright was busy with the Suburban, Sluti was able to remove the chain on her wrist and throw it in a ditch. The chain was later discovered by a neighbor who turned it over to the local sheriff.

Wright took Sluti and left Nebraska, passed through South Dakota, and the next day, stopped the Suburban in a field. Sluti testified that she believed the field was in Wyoming. He used duct tape to bind Sluti's hands tightly behind her back and duct-taped her legs together in several places and then blindfolded her. Wright told Sluti, "Well, I'll make you a deal. If you can get the tape off, I'll let you go." Sluti hopped over to a barbed-wire fence where she attempted to cut the duct tape off her wrists with the barbed wire. Instead, in the process, she cut her wrist and hand. She told him that her shoulders hurt from being bound so tightly and asked him to take the tape off. He responded, "No, you whine too much." After watching her struggle, Wright removed the duct tape from around her legs. He tried to remove the duct tape from her wrists first with a key, then a glass shard, and then a razor blade, but still was unable to get the tape off, so he tried to burn it off with a lighter. In the process, he burned her arm.

Later that evening, between 9:50 and 10:00 p.m., Wright told Sluti to call one of her friends but not her parents and tell the friend that she had gone on vacation. Wright held his ear closely to the phone, so he could monitor the conversation. Sluti called home and asked for "Elaine." Unbeknownst to Wright, Elaine is Anne's mother. A friend of the family answered the phone and spoke to Anne briefly. When Anne made no mention of being on vacation, Wright became angry and made her hang up. He then told her to call another friend. Anne called Jenessa Caha. When Caha asked where she was, Anne was forced to hang up the phone again.

The next morning, on April 8, 2001, Wright duct-taped Anne Sluti's legs and wrists and placed duct tape across her eyes. He then drove her to a remote location, near Livingston, Montana, and cut off her clothes with a knife. She pleaded with him

-4-

not to rape her and told him she was a virgin.  He raped her.  He told her afterwards he was going to take her to the mountains and rape her four times a day.

Later that morning, Wright took Sluti and they entered Mark Wesen's cabin, just west of Livingston.  Wright stole Wesen's Remington model 721 rifle from the cabin.  They then went inside a nearby cabin.  While Wright was upstairs, Sluti found a telephone.  She turned on the water and turned up the radio and then dialed 911 and asked for help.  Sluti told the 911 dispatcher that she was from Nebraska and that she had been kidnaped.  Wright discovered Sluti on the phone and started yelling at her.  Wright immediately took items from the cabin, loaded up the Suburban, and ordered Sluti to get in and lie down on the seat.  As they drove away, he started yelling at her, asking her why she called the police, and saying something like "I might as well shoot you in the head now" and "It's all over for you."  By the time the sheriff and SWAT team arrived at the cabin, Wright and Sluti were gone.

After leaving Livingston, Wright took Sluti to Belgrade, Montana.  He broke into Anita Fuhrman's house, ransacked the house, and then raped Sluti a second time.  He then brought Sluti next door to John Koon's house; Koon opened the door and saw a large man standing next to a young woman with a big black eye.  Koon later identified the man as Anthony Wright and the woman as Anne Sluti.  Upon being seen by Koon, Wright immediately took Sluti next door to Shawn Swidecki's house, where he kicked in the front door and removed a piggy bank, foodstuffs, and lingerie.  He then took the Swideckis' blue Toyota Tercel and abandoned the Suburban.  Wright took Sluti in the Tercel and drove until he came upon a group of summer cabins at Salmon Lake, Montana.  He forced his way into a red cabin where they stayed for two days.  Wright removed the phone from the wall, smashed it, placed it in the stove, and burned it.  He also burned the clothing that he had previously cut off of Sluti.  He raped her for a third time in the master bedroom during these two days.  Knowing that Wright was trying to destroy evidence of what had occurred, Sluti hid the semen-stained underwear in a kitchen trash can in the hope that it would be found and used

as evidence. She also hid two notes in case the owners of the cabin came back. She wrote inside a paperback book, "Anne Sluti 4-10-01 HELP! I [love] my mom, dad and brother," and placed it on a shelf in the bookcase, where it was later found. She left the other note which said, "Anne Sluti was here April 2001" behind the kitchen window sill where it was also found.

After leaving Salmon Lake, Wright took Sluti and continued to travel further northwest in Montana. He stopped twice during this time; once to fill up the car with gas and a second time to purchase ammunition. Before entering the second store, he chained Sluti's wrists and feet, taped her mouth shut and placed her in the trunk of the car. On April 10, 2001, Wright arrived at Flathead Lake near Rollins, Montana and broke into another cabin by kicking in the door. That evening, while Wright was in the bathroom, Sluti turned on the television and learned that the police knew of her kidnaping and were searching for the Suburban and the Toyota Tercel. The next day, Wright saw the news and became very upset. He remarked, "Oh, if we're going to get caught, we might as well have some fun" and told her to take her clothes off. When she refused, he took them off and raped her for a fourth time.

On April 11, 2001, a neighbor observed the Toyota Tercel backed up to the cabin at 835 Lake Shore Drive and notified the Sheriff's Office a little after 5 p.m. Detective Andrew Cannon arrived at approximately 5:40 p.m., and met with several other Sheriff's Office employees who were blocking off the roads leading to the cabin. Before the officers arrived at the cabin, Wright was able to retrieve the car, drive it to a neighboring cabin at 901 Lake Shore Drive, kick in the door, and conceal the Tercel in the garage. He then barricaded the doors with furniture. The officers eventually discovered the second cabin and surrounded it. Wright refused to surrender and an eight-hour standoff ensued. During the standoff, Wright threatened to torture or kill Sluti if she made any noises. He also told her to make multiple phone calls to 911, to her family, and to Wright's mother and wife, and he urged Sluti

to tell them all that she had not been kidnaped. Wright finally surrendered at 3:15 a.m. on April 12, 2001.

Following Wright's surrender, Sluti was taken to the emergency room of a local hospital where she was treated by Dr. Lynne Holz. Dr. Holz observed and treated Sluti's black eye which included a conjunctival hemorrhage, or bruising of the white part of the eyeball. She also observed and treated the burn mark to Sluti's right forearm and lacerations near her left thumb. Dr. Holz observed considerable bruising around Sluti's arm, wrists, and legs, in a band-like pattern consistent with a history of being restricted and bound by tape and chains. Based on a physical examination, she confirmed that Sluti had been a virgin prior to the sexual assaults.

After searching the cabin at Salmon Lake, law enforcement recovered the evidence that Sluti had hidden, including the two notes and the underwear. Fingerprint analysis confirmed that Wright's prints had been found on the driver's side front quarter panel of the Suburban, on a revolver removed from the linen closet in the cabin at 901 Lake Shore Drive, and on a rifle recovered from the same cabin. Sluti's fingerprints were found on the phone from the cabin near Livingston, Montana, where she had attempted to make a 911 call. Her prints were also found on the back window of the Suburban, and on the book recovered from the cabin at Salmon Lake. Hair was taken from a piece of duct tape recovered from the floor of the Suburban and was confirmed to be Sluti's through Mitochondrial DNA examination. Nuclear DNA examination of semen taken from the panties recovered from the cabin matched Wright's DNA. Other matter taken from the panties matched Sluti's DNA. In addition, vaginal swabs taken from Sluti in the emergency room indicated that Wright was the male contributor.

On June 19, 2002, the jury returned its verdict finding Wright guilty on both counts. On September 16, 2002, Wright was sentenced by the district court to a term of life imprisonment on the kidnaping conviction and a term of seven years, to be

served consecutively, for knowingly brandishing a firearm in furtherance of this crime.

## I.

Wright first argues that the evidence presented at trial was insufficient to support his convictions for kidnaping and for knowingly brandishing a firearm in furtherance of a crime of violence.

In reviewing a sufficiency-of-the-evidence challenge to a conviction, we view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government and accepting all reasonable inferences which may be drawn from the evidence which support the jury's verdict. United States v. Crossland, 301 F.3d 907, 913 (8th Cir. 2002). A conviction may be based on circumstantial or direct evidence or both. United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992); United States v. Sadler, 234 F.3d 368, 372 (8th Cir. 2000). We will reverse a conviction only "if we can conclude that a reasonable fact finder must have entertained a reasonable doubt about the government's proof concerning one of the essential elements of the crime." United States v. McCarthy, 97 F.3d 1562, 1568 (8th Cir. 1996).

In order to convict a defendant under the federal kidnaping statute, the government must prove that the victim was involuntarily transported in interstate commerce. See United States v. Toledo, 985 F.2d 1462, 1467 (10th Cir. 1993). Because lack of consent is an element of 18 U.S.C. § 1201, the individual charged may raise a valid defense that the victim consented to accompany him in interstate travel. Id. However, we have observed, "[T]he testimony of a kidnapping victim that he or she was transported involuntarily is . . . normally sufficient to support a jury finding that the victim was in fact transported involuntarily." United States v.

Hernandez-Orozco, 151 F.3d 866, 869 (8th Cir. 1998). During trial, Anne Sluti testified that Wright abducted her by force and against her will.

Wright argues that Sluti's conduct during the six-day period demonstrates a pattern of consent to being transported. He relies upon the Eleventh Circuit decision in United States v. Chancey, 715 F.2d 543 (11th Cir. 1983), where the defendant's conviction was overturned because the government failed to prove that the victim was transported involuntarily. However, the circumstances in Chancey were vastly different from the present case. In Chancey, there were no third party witnesses to the abduction. Id. at 544. Five people heard Anne Sluti screaming and saw Wright trying to push her into the car as he brutally beat her with his fists, leaving a black eye and facial bruises which were still apparent a week later. In Chancey, the victim testified that she consented to having sex with the defendant on several occasions. Id. at 545, 547. Anne Sluti testified that Wright raped her four times. A medical examination done immediately after her rescue verified that she was subject to intercourse by force. In Chancey, the victim made no effort to alert others while she was in public with the defendant, and she actually drove the car used to transport her out-of-state. Id. at 545. Anne Sluti was bound and tied up on multiple occasions, which left physical marks on her wrists and legs and patterns of bruises which were visible days later. The few times she was left alone, she made efforts to alert the authorities, including her 911 call from Livingston, Montana and the notes she left behind in the cabin in Salmon Lake, Montana. Finally, Sluti was freed only after Wright engaged in an eight-hour standoff with the police. We conclude that the evidence is sufficient to support Wright's conviction on Count I.

Wright next contends that there was insufficient evidence to convict him of brandishing a firearm while committing a crime of violence. Sluti testified that Wright held a gun to her as he told her to get out of her car; that she grabbed her compact discs and purse while he was holding the gun; that he then grabbed her and pushed her into the Suburban; and that when she tried to escape he began hitting her

severely with his fists. While the witnesses in the parking lot testified that they only saw the beating and did not see the revolver, several of the witnesses had their views of the scene blocked by Wright himself. All of the witnesses were between seventy-five and two hundred yards away when they heard the screams and turned to look, and none saw the initial confrontation. At trial, Sluti testified that shortly before Wright surrendered, she saw him hide the handgun used during her abduction behind a linen closet. She told the FBI agents where they could find the gun, and they later discovered it in a crevice behind the linen closet. Sluti testified that she believed that the firearm recovered by the FBI agents was the same firearm used by Wright during her abduction. In addition, an FBI fingerprint specialist testified that the latent print taken from the revolver matched a print on Wright's fingerprint card. A reasonable juror could have concluded beyond a reasonable doubt that Wright brandished a firearm while kidnaping Sluti. We therefore affirm Wright's conviction on Count II.

II.

Second, Wright argues that the district court erred by allowing Dr. Lynne Holz to testify about statements Anne Sluti made to her. Wright claims that these statements were not reasonably pertinent to medical diagnosis or treatment and were therefore not admissible under the hearsay exception of Federal Rule of Evidence 803(4). Wright contends that Holz's recounting of Sluti's statements had the impermissible effect of bolstering Sluti's testimony and should have been excluded.

We normally review the district court's decision to admit evidence under Rule 803(4) for abuse of discretion. See United States v. Sumner, 204 F.3d 1182, 1185 (8th Cir. 2000). However, because Wright did not object to the medical history testimony at trial, we review for plain error. United States v. Campa-Fabela, 210 F.3d 837, 840 (8th Cir. 2000). Under Fed. R. Crim. P. 52(b), we may notice an error not raised below where the error is plain, affects the defendant's substantial rights, and

-10-

seriously affects the fairness of the proceeding. United States v. Francis, 327 F.3d 729, 737 (8th Cir. 2003) (citing United States v. Olano, 507 U.S. 725, 732 (1993)).

To be admissible under Rule 803(4), a statement must meet two criteria. First, the declarant's motive in making the statement must be for "purposes of medical diagnosis or treatment." United States v. Gabe, 237 F.3d 954, 957-58 (8th Cir. 2001).[5] Second, the content of the statement must be "pertinent" such that it is the kind of statement reasonably relied upon by health care providers in treatment or diagnosis. See Lovejoy v. United States, 92 F.3d 628, 632 (8th Cir. 1996).

Holz testified that she introduced herself to Anne Sluti as the emergency room doctor who would be attending to Sluti's medical needs and that Sluti provided written consent to medical treatment. In addition, Dr. Holz stated that she took a history from Sluti of the incidents of the previous seven days in order to treat her injuries and make a diagnosis. There was sufficient foundation for the district court to conclude that statements Sluti made to Dr. Holz were for the purposes of medical diagnosis or treatment.

In addition, we must examine whether or not Sluti's statements, as recounted by Dr. Holz in her testimony, were "pertinent," or the kind of statement reasonably relied on by health care providers in treatment or diagnosis. There were indeed several statements by Sluti to Dr. Holz which only peripherally related to medical diagnosis and treatment, if at all. In particular, Dr. Holz testified that Sluti stated that a man Sluti did not know or had not met before had a gun and forced her into his

---

[5]Statements made by a patient for the purposes of medical diagnosis or treatment are an established exception to the hearsay rule because a "statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony." White v. Illinois, 502 U.S. 346, 356 (1992).

-11-

vehicle and that she was later threatened with a knife. Because Wright did not object to these two statements, the district court was unable to rule on this objection.[6] Most of Dr. Holz's interview with Sluti, as recounted in Holz's testimony, was made up of hearsay statements which were reasonably pertinent to medical diagnosis and treatment. The two questionable statements that Holz attested to simply repeated allegations which were elaborated upon more fully during Sluti's own testimony. Sluti testified in detail about Wright's use of a handgun during her abduction in the parking lot, and she also stated that he used a knife to cut off her clothes when he first raped her. She was subject to cross-examination by defense counsel regarding this testimony.[7]

Even if the two statements to Dr. Holz now challenged by Wright might have been excluded at trial upon proper objection, they did not substantially affect his rights or the fairness of the proceeding because Holz's testimony as to these statements was cumulative of Sluti's testimony; therefore, we hold that the district court's admission of this testimony did not constitute plain error.

---

[6]Earlier in Dr. Holz's testimony, Wright did object when Dr. Holz testified that Sluti had "revealed that she had made statements that were untrue in talking on the telephone with the law enforcement officers when she was negotiating the release from her kidnapper" on the grounds that this statement did not fit under the Rule 803(4) hearsay exception. The district court questioned the admissibility of this testimony under Rule 803(4) but held that the statement was consistent with Sluti's testimony and could be offered to rebut an express or implied charge against Sluti of recent fabrication or improper influence or motive and thus could be admitted under Federal Rule of Evidence 801(d)(1)(B).

[7]Because Sluti testified about these allegations and then was cross-examined regarding the truthfulness of her account, it is possible that these statements made to Dr. Holz would have been admissible under Federal Rule of Evidence 801(d)(1)(B) as prior consistent statements offered to rebut an express or implied charge against Sluti of recent fabrication or improper influence or motive.

## III.

Third, Wright argues that the district court abused its discretion by not striking Vivian Bianchi for cause during voir dire and by failing to remove juror Nancy Kramer from the jury panel after it was alleged that she made improper comments.

The district court has substantial discretion in conducting voir dire, so most rulings on juror challenges are reviewed for abuse of discretion. United States v. Blom, 242 F.3d 799, 805 (8th Cir. 2001). We will not interfere with the district court's discretion to strike jurors for cause "absent a showing of actual prejudice." United States v. Johnson, 906 F.3d 1285, 1288 (8th Cir. 1990).

The Sixth Amendment guarantees the defendant the right to trial "by an impartial jury." Impartiality is presumed "so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." United States v. Evans, 272 F.3d 1069, 1078 (8th Cir. 2001) (quoting Lockhart v. McCree, 476 U.S. 162, 184 (1986)), cert. denied, 535 U.S. 1029 (2002). The test for assessing impartiality asks whether the prospective juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Johnson, 906 F.3d at 1288 (internal quotation marks omitted).

Wright argues that Bianchi should have been stricken for cause because her statements during voir dire suggested an assumption of guilt. During voir dire, she admitted that she had learned about the kidnaping on television, that she "couldn't believe it," was "amazed" that it happened, and was angry that "somebody would do something to a child like that." However, when asked specifically about her ability to hear the evidence impartially, Bianchi stated that if she were in Wright's position, she would want somebody in her frame of mind to sit on the jury in this case and that she could put her anger aside if she heard all of the evidence. She also said that she understood that Wright was innocent as he sat right now and entitled to a presumption

of innocence. When defense counsel asked her whether she could follow the court's instructions as to the presumption of innocence, Bianchi replied "I hope I could." When counsel asked whether she could give Wright the presumption of innocence which he deserves in this case, she changed her response to "I think I could" and then to "I can't say yes or no." However, after these equivocal responses, Bianchi stated that she would not have to overcome any personal feelings to find Wright innocent and that her anger would not affect her ability to be fair and impartial. The court denied Wright's motion to strike Bianchi for cause. Wright then used a peremptory challenge to remove Bianchi. Wright now claims that the decision not to strike Bianchi for cause was error because it prevented him from exercising one of his peremptory challenges to remove juror Nancy Kramer.

The district court explained its decision in the following way: "It is true that she [Bianchi] expressed anger at the nature of the crime, but not aimed at the defendant. She said that she would want somebody of her frame of mind on the jury if she were in [Wright's] shoes. I could find no justification for removing her for cause." The district court did not abuse its discretion in refusing to strike Bianchi for cause on these grounds. Bianchi's statements showed anger at the crime in response to reports she had seen on television, but she also expressed a willingness to listen to the evidence and the ability to find Wright innocent. In any case, because Bianchi was removed by means of a peremptory challenge and did not sit as a juror, Wright has the burden of showing that the jury which actually heard the evidence was not impartial. See United States v. Horsman, 114 F.3d 822, 825 (8th Cir. 1997) ("[F]or this Court to reverse the district court, [defendant] has the burden of showing that the jury which did sit was biased."). The only sitting juror that Wright alleges was biased is Nancy Kramer, but as we explain below, the dispute over Kramer's alleged statements at a birthday party did not require that she be removed from the jury.[8]

_____

[8]We note in passing that Kramer's alleged statements occurred after voir dire, so even if the district court had granted Wright's motion to strike Bianchi for cause,

-14-

Hence, the district court did not abuse its discretion in holding that Wright failed to meet his burden of showing that the jury which sat in his case was not impartial.

Wright's second challenge concerns the district court's denial of his motion to strike Juror Nancy Kramer for cause. On the second day of testimony, defense counsel asked the court to conduct an inquiry out of presence of the jury with Kramer to see if she had formed any opinions about the defendant or had spoken about the case. Defense counsel stated that his paralegal had been at a birthday party in Lincoln and had overheard Kramer tell her sister that Wright and his attorney looked scary. The court asked Kramer if she had expressed her thoughts or feelings about the defendant to her sister. Kramer responded that she had not shared her thoughts about Wright, and that the only thing she told her sister-in-law was that "you're innocent until proven guilty." She stated, "[I]f it were one of my kids on there, that's the way I would want it to be too." Again the court asked her if she made any comments about the defendant's appearance. Kramer replied, "Not him per se. I said all the attorneys and everybody were looking at the jurors. That's all I said." Finally, the court asked her if there was anything else which led her to form some opinion about Wright's guilt or innocence in this case. Kramer stated that she had not changed her mind since filling out the questionnaire, that she still believed that a person is innocent until proven guilty. Following this interview, the court denied defendant's motion to remove Kramer for cause.

Based on its inquiry, the district court concluded that Juror Kramer had an open mind when she was selected and continued to maintain an open mind through the second day of testimony. There was no evidence, aside from the memorandum submitted by defense counsel, that Kramer made improper comments or was unable

_____

there is no indication that Wright would have used his peremptory challenge on Kramer since there was no evidence of her possible bias during voir dire.

-15-

to hear evidence impartially. Accordingly, the court did not abuse its discretion in denying Wright's motion to strike Kramer from the jury panel.

IV.

Finally, the district court sentenced Wright under the career offender enhancement of Sentencing Guideline § 4B1.1 because Wright was older than 18 when he committed the instant offense, the instant offense is a felony crime of violence, and he has at least two prior felony convictions for crimes of violence. Wright argues that his two prior burglary convictions should not automatically be considered "crimes of violence" for the purposes of the career offender enhancement because burglary can be committed without the victim present and therefore does not necessarily involve violence.

We review the district court's factual findings for clear error and its application of the sentencing guidelines de novo. United States v. Sun Bear, 307 F.3d 747, 750 (8th Cir. 2002), cert. denied, 123 S.Ct. 2275 (2003).

Sentencing Guideline § 4B1.2(a) defines a "crime of violence" as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that-- . . . (2) is burglary of a dwelling . . ." In classifying burglary of a dwelling as a crime of violence, the Guidelines do not distinguish between dwellings that are occupied versus those that are unoccupied; thus, burglary of a dwelling is a crime of violence regardless of whether there was anyone present in the dwelling during the burglary. United States v. McClenton, 53 F.3d 584, 588 (3d Cir. 1995). Both of Wright's second degree burglary convictions were for burglarizing a residence--one in Anoka County, Minnesota and the other in Charles City, Iowa. There is no merit to his legal argument that these burglaries were not "crimes of violence" as defined by the Sentencing Guidelines.

-16-

Having considered and rejected any possible errors by the district court, we affirm the conviction and sentence of Anthony S. Wright.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.